PARTIDO POPULAR DEMOCRÁTICO, LUIS MUÑOZ MARÍN, SAMUEL R. QUIÑONES y DAVID BENJAMÍN CRUZ, *v.* JUNTA INSULAR DE ELECCIONES DE PUERTO RICO, CHARLES H. TERRY, SUPERINTENDENTE GENERAL DE ELECCIONES DE PUERTO RICO, LEOPOLDO FIGUEROA, LUIS E. DUBÓN, LINO PADRÓN RIVERA, JOSÉ C. MARRERO y ADOLFO GARCÍA RODRÍGUEZ, todos en su carácter de miembros de la Junta mencionada.

Núm. 396.—*Sometido:* Marzo 16, 1944. *Resuelto:* Marzo 28, 1944.

*Samuel R. Quiñones, Luis A. Negrón López* y *Miguel Guerra-Mondragón,* abogados de los peticionarios; *F. Fernández Cuyar, Leopoldo Figueroa, A. García Rodríguez* y *Cayetano Coll y Cuchí,* abogados de la Junta Insular de Elecciones; *Hon. Procurador General Auxiliar M. Rodríguez Ramos* y *G. Benítez Gautier, Procurador General Auxiliar,* abogados del Superintendente General de Elecciones; *H. González Blanes,* abogado de la parte interventora, Partido Unión Republicana.

OPINIÓN EMITIDA POR EL JUEZ ASOCIADO SEÑOR DE JESÚS.

En las inscripciones celebradas en esta Isla los días quince y dieciséis de enero último se presentaron en las distintas juntas de inscripciones un total de 277,471 peticiones de inscripción. De ese total, 85,019 peticiones, aunque no fueron protestadas, no reúnen los requisitos exigidos por la ley.

Un número de ellas no aparecen siquiera firmadas por los supuestos peticionarios, y en los casos de no saber firmar, no aparece en ellas la impresión de sus huellas digitales como exige la ley. En otras, no aparece la firma del testigo de identificación. En otras, no aparece la firma de miembro alguno de la junta de inscripciones autorizando el juramento del elector. En otras, el nombre del elector que aparece en el apartado número uno de la petición es distinto al nombre que aparece en el apartado correspondiente a la firma del elector. Por último, un número de las peticiones no están firmadas por los miembros de la junta de inscripciones donde se presentaron dichas peticiones.

Enviadas esas 85,019 peticiones al Superintendente General de Elecciones conjuntamente con las otras no protestadas que no adolecían de los defectos apuntados, la Junta Insular de Elecciones, al clasificarlas en la forma dicha, acordó por mayoría de sus miembros no incluir dichas 85,019 peticiones en el libro registro de electores, y consecuentemente el Superintendente General de Elecciones rehusó pasar los nombres de esos 85,019 electores a la lista para cada precinto electoral de electores nuevamente inscritos, conforme prescribe la sección 27 de la Ley Electoral.

Sintiéndose agraviados por' el referido acuerdo de la Junta Insular de Elecciones y por la resolución del Superintendente General de Elecciones, el Partido Popular Democrático, Luis Muñoz Marín, Samuel R. Quiñones y David Benjamín Cruz presentaron en este tribunal la petición de *mandamus* de este caso: el Partido Popular Democrático alegando que de esas 85,019 personas que presentaron peticiones de inscripción y que se verían privadas del voto de prevalecer la actitud de la Junta y del Superintendente General de Elecciones, más de cincuenta y cinco mil están afiliadas al referido partido; Luis Muñoz Marín porque según alega ha de ser nominado y postulado como candidato por dicho Partido para uno de los cargos insulares de elección

popular en las elecciones generales que se efectuarán el siete de noviembre próximo; Samuel R. Quiñones, por ser elector del segundo precinto de San Juan, debidamente inscrito y capacitado, y miembro a la vez de la Junta Insular de Elecciones en representación del Partido Popular Democrático; y finalmente David Benjamín Cruz, alegando que es ciudadano de los Estados Unidos de América, que tendrá el 7 de noviembre de 1944 más de un año de domicilio en Santurce; que compareció a inscribirse y se inscribió como elector de acuerdo con las disposiciones de la Ley de Inscripciones ante una de las juntas de inscripciones del precinto de Santurce, habiendo presentado su petición ante dicha junta en el modelo impreso prescrito en la sección 16 de la Ley de Inscripciones, no apareciendo llenos algunos de los blancos de dicha petición comprendidos en sus apartados 22 al 27.([1]) Continuó alegando dicho demandado que la junta de inscripciones le entregó uno de los duplicados de su petición de inscripción, el cual, juntamente con una copia certificada del original de la mencionada petición, acompañó a la demanda de este caso haciéndolos formar parte de ella y marcándolos *exhibits* dos y tres respectivamente; que su petición de inscripción no fué protestada, y ello no obstante dicho peticionario, por estar comprendida su petición entre las 85,019 de que se ha hecho mérito, quedará privado del voto a virtud de ciertas reglas aprobadas por la Junta Insular de Elecciones el 24 de enero de 1944, por las cuales se prescribe que los defectos de que adolecen dichas 85,019 peticiones de inscripción dan lugar a que las mismas sean canceladas y no se incluyan en el libro registro de electores. Alega además el demandante David Benjamín Cruz que comparece por sí y en representación de la clase de electores inscritos los días quince y dieciséis de

([1]) Parece conveniente advertir que entre los apartados que aparecen en blanco en la petición de inscripción se halla nada menos que el correspondiente a la firma del miembro de la junta de inscripciones que debió autorizar el juramento de David Benjamín Cruz.

enero último que resultan afectados por las referidas reglas, y que comparece en representación de dicha clase por ser ella demasiado numerosa para poder incluirse sus miembros como demandantes en esta acción.

Alegan los demandantes que las referidas reglas son nulas por no haber sido aprobadas por el Gobernador, pero que en el supuesto de que lo hubieren sido, también serían nulas porque la Junta Insular de Elecciones carece de facultades para intervenir con la validez de dichas 85,019 peticiones de inscripción que no fueron protestadas, correspondiendo la facultad de investigar el contenido de dichas peticiones exclusivamente a las respectivas juntas de inscripciones, las cuales una vez cumplida su gestión en los días quince y dieciséis de enero de 1944 dejaron de tener existencia legal.

En apoyo de esa conclusión se alega una serie de fundamentos, marcados con las letras "a" a la "p" inclusive, que no exponemos por no hacer innecesariamente larga esta opinión, sin que por ello dejemos de considerar aquellos fundamentos que merezcan discusión.

Protestando no tener otro remedio rápido, adecuado y eficaz fuera del recurso de mandamus, termina la demanda con súplica de que se expidan dos autos perentorios de mandamus, uno dirigido a la Junta Insular de Elecciones de Puerto Rico y a sus miembros Charles H. Terry, Leopoldo Figueroa, Luis E. Dubón, Lino Padrón Rivera y Adolfo García Rodríguez, para que procedan, con arreglo a la sección 25 de la Ley Electoral de Puerto Rico, a incluir en el libro registro de electores a todos los ciudadanos que se inscribieron en las inscripciones generales celebradas los días quince y dieciséis del mes de enero de 1944, incluyendo desde luego a los 85,019 ciudadanos cuyas peticiones de inscripción son defectuosas, sin anular o cancelar dichas peticiones; y otro dirigido a Charles H. Terry, en su carácter de Superintendente General de Elecciones de Puerto Rico, para que proceda inmediatamente a hacer preparar para cada precinto

electoral, por barrios y por orden alfabético, una lista de todos dichos electores, expresándose en ella el nombre, edad, color, sexo y dirección de los inscritos, conforme dispone la sección 27 de la Ley Electoral de Puerto Rico.

Suplican además los demandantes se ordene a los demandados que se abstengan, hasta nueva orden de este tribunal, de cancelar o anular petición de inscripción alguna de las referidas 85,019.

Expedidos los autos condicionales de mandamus en la forma solicitada, se dió principio a la vista el trece del actual, en cuya fecha comparecieron la Junta Insular de Elecciones y sus miembros demandados, incluyendo al señor Terry, radicando todos una sola contestación oponiéndose a las pretensiones de los demandantes. ·En la misma fecha se radicó una moción de allanamiento a la petición de mandamus, suscrita por el Procurador General de Puerto Rico, en representación del Superintendente General de Elecciones, en la cual el Superintendente General de Elecciones, entre otras cosas, expone que después de haber leído debidamente la petición de mandamus así como el auto alternativo expedido, está conforme con lo solicitado por los demandantes. El Partido Unión Republicana solicitó y se le concedió sin oposición de las partes, comparecer en el caso como parte demandada.

En el acto de la vista la Junta Insular de Elecciones declaró que su facultad para rechazar dichas 85,019 peticiones de inscripción no está predicada en las reglas de 24 de enero de 1944, de las cuales prescinde a todos los efectos de este caso, alegando que su facultad surge de los preceptos de la Ley de Inscripciones y de la Ley Electoral.

La primera cuestión a determinar es si la Junta Insular de Elecciones tiene poder para rehusar incluir en el libro registro de electores peticiones de inscripción que no fueron protestadas ante las respectivas juntas de inscripciones, a pesar de que dichas peticiones no cumplen con los requisitos

exigidos por las secciones 16, 17, 18 y 19 de la Ley de Inscripciones.(¹ᵃ)

De la faz de la demanda surge claramente a nuestro juicio que las 85,019 peticiones de inscripción no cumplen con una o más de las referidas secciones.

Concedemos que no existe precepto legal que de una manera expresa autorice a la Junta Insular de Elecciones para examinar peticiones de inscripción no protestadas y rehusar incluir en el libro registro de electores los nombres de aquellas personas cuyas peticiones de inscripción no se ajustan a los requisitos exigidos por la Ley de Inscripciones. Pero no abrigamos duda de que ese poder surge implícitamente de varias secciones de la referida ley. Así vemos que la sección cuatro de la Ley de Inscripciones prescribe que la Junta Insular de Elecciones tendrá a su cargo *la inspección y dirección de las inscripciones* en Puerto Rico,

---

(¹ᵃ) Las mencionadas secciones prescriben:

"Sección 16.—El elector que desee inscribirse, comparecerá ante la junta de inscripciones correspondiente y le presentará una petición impresa, en triplicado, llenando los blancos con tinta, o a maquinilla, con arreglo al modelo que a continuación se expresa.

"Cada petición deberá ser firmada por el interesado y un testigo, vecino del mismo municipio, persona conocida y, que sepa leer y escribir, quien declarará que le constan como ciertas todas las manifestaciones contenidas en la petición, y jurará junto con el peticionario: [sigue el modelo de inscripción].

"Sección 17.—Cuando el solicitante no supiere o no pudiere firmar, estampará la huella de los dedos pulgares de ambas manos, si fuere posible, al lado de la firma del testigo que firma por dicho elector.

"  "  *        *        *        *        *        *

"Sección 18.—Las peticiones no se admitirán sino en hojas impresas, con arreglo al expresado modelo, y será deber de la junta de inscripciones, cuando reciba alguna petición que no concuerde con el modelo oficial, expresar el motivo de la falta, y firmará, actuará y se procederá como si se tratase de una inscripción protestada.

"Sección 19.—Las peticiones de inscripción *deberán jurarse ante cualquier miembro propietario o substituto* de la junta de inscripciones del colegio a la cual correspondieren, *en el local de inscripciones de dicha junta, y durante las horas debidamente fijadas y proclamadas para inscripciones en dicho local;* y todo miembro propietario y substituto de una junta de inscripciones, queda por la presente autorizado para tomar el juramento sobre dichas peticiones, en los locales y en los períodos de tiempo especificados. A las peticiones de inscripción se les pondrá el número correlativo de presentación." (Bastardillas nuestras.)

y la autoriza además para preparar modelos en blanco de peticiones de inscripción y modelos de recusaciones y contra-recusaciones; y la sección 25 le confiere facultad para dictar reglas y reglamentos conducentes a llevar a cabo inscripciones pacíficas y *legales*. Por último, la sección 31 en lo pertinente dice: "pero se declara expresamente que todas aquellas disposiciones de la referida Ley Electoral que no están en conflicto con las disposiciones de ésta, podrán ser aplicadas por la Junta Insular de Elecciones, siempre que fuere necesario, *para llevar a cabo unas inscripciones pacíficas y legales.* (Bartardillas nuestras.)

Sostener que un organismo gubernativo a quien la Asamblea Legislativa impuso el delicado deber de *inspeccionar y dirigir* las inscripciones en Puerto Rico; a quien le confió la facultad de preparar modelos en blanco de peticiones de inscripción; a quien le concedió el poder de dictar reglas y reglamentos conducentes a llevar a cabo inscripciones pacíficas y *legales,* y a quien expresamente autorizó para *aplicar* todas aquellas disposiciones de la Ley Electoral que no estén en conflicto con las de la Ley de Inscripciones, siempre que fuere necesario para llevar a cabo unas inscripciones pacíficas y *legales*; sostener, repetimos, que ese organismo carece de la facultad de rechazar y que tiene que admitir como válidas peticiones de inscripción que adolecen de los defectos antes expuestos, equivale a empeñarse en no querer ver lo que por exceso de claridad hiere las pupilas. ¿Se aviene acaso esa interpretación con los poderes que el legislador como hemos visto confirió a la Junta Insular de Elecciones? ¿Es lógico sostener, como se pretende, que las juntas de inscripciones, cuya misión como alegan los propios demandantes termina al expirar el último día fijado para recibir las peticiones de inscripción, tengan más poderes que la Junta Insular de Elecciones que las nombra,([1b]) y que a pesar de los serios

([1b]) La única facultad que al Superintendente General de Elecciones concede la Ley de Inscripciones en su sección 6 consiste en el deber ministerial de nombrar, a propuesta del órgano director central o local del partido que representa

deberes impuéstosle por la ley, venga aquélla obligada a aceptar ciegamente las actuaciones de las juntas de inscripciones por ilegales que ellas sean? En el caso de *Sibley* v. *Staiger* (Ill., 1932), 179 N. E. 877, 878, se sostuvo que "Si bien es regla establecida que los errores u omisiones de los funcionarios a cargo de una elección no podrán anular la voluntad claramente expresada de los electores, sin embargo, esa regla no se aplica cuando," como en el presente caso, "los funcionarios han dejado de cumplir deberes imperativos que comprenden precauciones tendentes a salvaguardar los votos de los electores."

Pero es que aparte de lo expuesto, los propios demandantes en el párrafo 19 de su petición de mandamus, y al acompañar y hacer parte integrante de dicha demanda el exhibit cinco que contiene las reglas aprobadas por la Junta Insular de Elecciones el primero de febrero de 1940, parecen admitir el poder de la Junta Insular de Elecciones para pasar sobre la validez o insuficiencia de las peticiones de inscripción *no protestadas* enviádasle por las juntas de inscripciones. Parece conveniente transcribir aquí el párrafo diecinueve de la demanda:

"Después de efectuadas las inscripciones generales de 1940 la Junta Insular de Elecciones aprobó por unanimidad, sin que en la votación interviniera el representante del Partido Popular Democrático que entonces todavía no tenía voto en dicha Junta, unas reglas para subsanar ciertos defectos en las peticiones de inscripción, semejantes a los defectos comprendidos en las reglas antes transcritas, y en 1940 sobre la base de tales reglas en dicho año aprobadas, la Junta Insular de Elecciones facilitó la corrección de las peticiones de inscripción defectuosamente llenas sin que ante la Junta Insular de Elecciones se presentara una sola queja por razón del procedimiento utilizado en 1940 para dicha corrección

cada uno de los miembros de la junta de inscripciones, disponiendo la misma sección que las vacantes que ocurrieren en estas juntas de inscripciones se cubrirán en la forma que provea la Junta Insular de Elecciones, siempre teniendo en cuenta que el sustituto deberá pertenecer al mismo partido político del miembro que ocasione la vacante.

de peticiones defectuosas. Las reglas aprobadas por la Junta Insular de Elecciones como antes se deja alegado se acompañan en copia debidamente certificada que se marca Exhibit V y se hace formar parte integrante, de esta demanda. Y alegan los demandantes que si en 1940 la Junta Insular de Elecciones *aprobó reglas para corregir como en efecto se corrigieron defectos en las peticiones de inscripción,* y para proteger como en efecto protegió en su derecho al sufragio a los electores· que se inscribieron a virtud de tales peticiones de inscripción defectuosas, la dicha Junta está impedida para aprobar en 1944 reglas que impidan corregir peticiones de inscripción defectuosas y que priven de su derecho al sufragio a los electores que se inscribieron a virtud de tales peticiones defectuosas.'' (Bastardillas nuestras.)

Veamos ahora las reglas que en febrero 1940 aprobó y aplicó la Junta Insular de Elecciones y a las cuales se refieren los demandantes en el párrafo diecinueve antes transcrito:

''La Junta Insular de Elecciones en sesión celebrada el día de hoy adoptó las siguientes reglas que regirán *en la revisión de las peticiones de inscripción no protestadas* (bastardillas nuestras):

''1. En caso en que aparecieren peticiones de inscripción sin la firma del elector o sin sus huellas digitales pero que aparezcan firmadas por lo menos por dos de los miembros de la Junta de Inscripción, las mismas serán remitidas al Presidente de la Junta Local de Elecciones del precinto correspondiente para obtener la firma de los electores que radicaron tales peticiones. El Superintendente General de Elecciones notificará a todos los miembros de la Junta Insular de Elecciones y a,los comités locales en los municipios donde existen tales peticiones de inscripción para facilitar la localización de los electores afectados quienes comparecerán ante la Junta Local de Elecciones integrada por todos sus miembros así como por el Observador, ante la cual los electores procederán a firmar tales peticiones o a estampar las huellas de sus dedos pulgares.

''2. En caso en que aparecieren peticiones de inscripción sin la firma de elector o sin sus huellas digitales si no supiere firmar, sin la firma por lo menos de dos de los miembros de una Junta de Inscripción, tales peticiones serán sometidas a la Junta Insular de Elecciones para su *cancelación.*

''3. En caso que aparecieren peticiones de inscripción firmadas por los electores respectivos o marcadas con sus huellas digitales,

pero carecieren de todas las firmas de los miembros de una Junta de Inscripción, tales peticiones serán sometidas a la Junta Insular de Elecciones para su cancelación.

"4. En caso que aparecieren peticiones de inscripción en que el nombre del elector, según figura en el Apartado 1, y su firma discreparan en forma total y absoluta, se procederá a someterlas a la Junta Insular de Elecciones para su *cancelación.*

"5. En caso que aparecieren peticiones de inscripción sin la firma del miembro que tomó el juramento, pero que aparecieren firmadas al calce por lo menos por dos de los miembros de una Junta de Inscripción, tales peticiones serán aceptadas como buenas; sin embargo, si tales peticiones están firmadas solamente por uno solo de los miembros de una Junta de Inscripción, dichas peticiones serán remitidas al Presidente de la Junta Local de Elecciones del precinto correspondiente para subsanar la omisión en cuanto a la firma de cualquiera otro de los miembros de la Junta de Inscripción del mismo colegio en que se inscribió el elector. En tales casos se actuará en forma similar según se expresa en el párrafo núm. 1.

"6. En caso que aparecieren peticiones de inscripción sin la firma del testigo de identificación en casos de electores que hayan firmado sus peticiones o estampado sus huellas, tales peticiones serán aceptadas como buenas.

"En San Juan, P. R., a 1 de febrero de 1940.

"Certifico: que el escrito precedente constituye traslado fiel y completo del original de su contenido, siendo dicho original las reglas aprobadas por unanimidad por la Junta Insular de Elecciones de Puerto Rico en la sesión del 31 de enero de 1940 con referencia a corrección de peticiones de inscripciones defectuosas. Certifico asimismo que todo ello resulta del Acta de dicha sesión que obra bajo mi custodia como Superintendente General de Elecciones de Puerto Rico.

"Y a petición oficial del Lic. Samuel R. Quiñones, de San Juan, y miembro propietario de la Junta Insular de Elecciones, libro la presente en esta ciudad hoy día primero de marzo de 1944.

"(Firmado) C. H. Terry, Superintendente General de Elecciones."

Si en febrero 1940, bajo el imperio de la misma ley que hoy rige, la Junta Insular de Elecciones tenía poder para revisar peticiones de inscripción no protestadas; si en el uso de esa facultad llegó la Junta hasta a permitir que con-

trario a la ley(²) los defectos de dichas peticiones fuesen subsanados; si como parecen admitir los demandantes en relación con defectos iguales a algunos de los que aparecen en las 85,019 peticiones la Junta podía llegar, en uso de su poder de revisión, hasta el extremo de cancelar ciertas peticiones sin ninguna clase de notificación, ¿qué razón legal pueden invocar ahora los demandantes para sostener como sostienen que la Junta Insular de Elecciones, en lo que respecta a la validez de las peticiones de inscripción, tiene que actuar como un mero autómata obligada a aceptar como buenas las peticiones que envían las juntas de inscripciones, sean cuales fueren los defectos de que tales peticiones adolecieren? ¿Pero es que pueden celebrarse elecciones legales a base de peticiones de inscripción que no reúnen los requisitos de autenticidad que exige la ley? El hecho de que el número de las peticiones defectuosas alcance a la elevada cifra de 85,019, no puede afectar el poder de la junta. Por el contrario, mientras más numerosas sean las peticiones que no cumplen con la ley, mayor será la posibilidad de que las elecciones no sean legales, y más celosa debe ser la junta en el cumplimiento de la difícil misión que le fuera confiada.

Se nos arguye que la facultad de determinar si las peticiones de inscripción reúnen o no los requisitos que taxativamente exige la Ley de Inscripciones, es una cuestión judicial que sólo puede ser determinada por los tribunales. No estamos conformes. Ese poder que la Junta Insular de Elecciones ejercitó en mil novecientos cuarenta y trata de ejercitar ahora es meramente ministerial. En el caso de *Scott* v. *Vaughan* (Mich., 1918), 168 N. W. 709, citado con aprobación en *People* v. *Kelly* (Mich., 1940), 293 N. W. 865, 871, y en *Larkin* v. *Gronna* (N. D., 1939), 285 N. W. 59, 66, se discute por la Corte Suprema de Michigan el alcance del deber ministerial. La sección 12 del artículo 16 de la Constitución de Michigan, en vigor desde el 30 de abril de 1918,

---

(²) Véase la sección 19 de la Ley de Inscripciones, transcrita en la nota núm. 1ª., ante, pág. 303.

prohíbe la fabricación, venta, posesión para la venta, etc., de licores embriagantes excepto para fines medicinales, mecánicos, químicos, científicos o sacramentales. El artículo 17, sección dos, de la citada Constitución dispone que pueden proponerse enmiendas a la Constitución por petición de los electores capacitados del Estado; que cada petición incluirá *el texto de la enmienda así propuesta,* y deberán ser firmadas las peticiones por no menos del diez por ciento de los electores capacitados del Estado; que esas peticiones deberán ser entregadas al Secretario de Estado por lo menos cuatro meses antes de la fecha de la elección en la cual la enmienda propuesta haya de ser votada; que al recibir dichas peticiones, el Secretario de Estado las examinará para determinar si han sido firmadas por el número de electores exigido por la Constitución, y si las peticiones han sido firmadas por el número requerido de electores, la enmienda propuesta será sometida a votación en la próxima elección regular en la cual haya de elegirse cualquier funcionario del Estado. Se prescribe además que la petición constará en hojas de papel con el encabezamiento escrito o impreso que designe el Secretario de Estado; que tales peticiones serán firmadas personalmente por los electores capacitados solamente, con la dirección de su residencia y la fecha en que fueren firmadas; que a cada una de dichas peticiones, que pueden constar de una o más hojas, se unirá el *affidavit* del elector que recoja las firmas, haciendo constar que cada una de ellas es la firma auténtica de las personas que las suscriben, y que a su mejor leal saber y entender, el firmante de la petición era al tiempo de firmarla un elector capacitado. Dispone además el precepto constitucional que tales peticiones así firmadas constituirán evidencia prima facie de que las firmas son auténticas y de que los firmantes son electores capacitados.

Los demandantes requirieron al Secretario de Estado para que se abstuviese de dar curso a las peticiones que le habían sido presentadas para enmendar la sección 12 del

artículo 16. de la Constitución, fundándose para ello en que
en dichas peticiones no se cumplía con el requisito de copiar
literalmente el texto de la enmienda propuesta. El Secre-
tario de Estado consultó al Procurador General, quien le
aconsejó debía llevarse el caso a los tribunales para que
estos determinasen si el Secretario de Estado estaba auto-
rizado para determinar si las peticiones de enmienda se
ajustaban a la ley o si por el contrario era ésa una cuestión
judicial a resolverse exclusivamente por los tribunales.

Se presentó el mandamus contra el Secretario, solicitando
que se le ordenase abstenerse de dar curso a las referidas
peticiones por no contener las mismas una copia exacta de
la enmienda propuesta. Expedida la orden para mostrar
causa, compareció el Secretario admitiendo los hechos de la
petición, alegando a la vez que su deber en relación con este
asunto era puramente ministerial, y que la determinación de
si las peticiones cumplían o no con la Constitución era una
cuestión judicial a ser resuelta por los tribunales y no por
él.

La corte, al decretar el mandamus con el voto unánime
de los ocho jueces que tomaron parte en la decisión, declaró
que en el derecho de los electores capacitados del Estado a
proponer enmiendas a la Constitución por medio de petición,
ordinariamente no tenían ingerencia la Asamblea Legisla-
tiva, las cortes ni los oficiales mismos a quienes se les impo-
nía algún deber en relación con dicho derecho. Ello no
obstante, el derecho *debía ser ejercitado de cierta manera y
de acuerdo con las condiciones especificadas en la Constitu-
ción.* Se resolvió además que la determinación de si la
petición incluía el texto completo de la enmienda propuesta
y de si las peticiones estaban firmadas por no menos del diez
por ciento de los electores capacitados del Estado, no envol-
vía el ejercicio de discreción, sino la ejecución de un deber
ministerial; que el cumplimiento de un deber ministerial
podía envolver algo más que la ejecución de una cosa pres-

crita en la forma prescrita. La persona debe apreciar el significado y efecto de lo que aparece en la faz de una petición antes de que ella pueda determinar de la faz de la misma si la que se le presenta es o no una petición. Lo mismo que el funcionario puede ser obligado por mandamus a dar curso a una petición correcta, puede también por mandamus ser compelido a rehusar dar curso a una petición incorrecta, puesto que es su deber rechazar las peticiones— por lo menos dejar de tomar acción subsiguiente sobre ellas —cuando dichas peticiones no se ajustan al mandato constitucional.

De igual modo, la Junta Insular de Elecciones para ejercitar el poder ministerial que le confiere la ley para ordenar que los nombres de las personas que han presentado peticiones de inscripción prima facie válidas sean incluídos en el registro de electores, tiene poder para examinar dichas peticiones para determinar si las mismas cumplen con las exigencias de la ley.

Parece conveniente citar aquí el caso de *Morrissey* v. *State Ballot Law Commission* (Mass., 1942), 43 N. E. (2) 385, 395, donde se sostiene que la posición de la persona que firma una petición de enmienda a la Constitución, es análoga a la de un elector que firma una papeleta de nominación para una elección o el que vota en una elección. El derecho que le garantiza la constitución es ejercitar su privilegio como elector de acuerdo con reglas razonables con respecto a la forma de votar.

Arguyen los demandantes que el dejar de incluir los nombres de las 85,019 personas en el libro registro de electores sin ser notificadas de su no inclusión, equivale a privarles del derecho al voto sin el debido procedimiento de ley. No debemos perder de vista, en primer término, que para que el derecho al voto exista, es necesario, como dijéramos antes, que el elector ejercite su derecho en la forma y bajo las condiciones requeridas por la ley, entre las cuales

se halla lá de presentar una petición de inscripción en la junta de inscripciones, que reúna los requisitos fijados por la ley. *Scott* v. *Vaughan,* supra; *In re Opinion of the Justices* (Mass., 1924), 143 N.E. 142. Pero es que esa notificación la tiene el elector en las listas que a más tardar el treinta y uno de marzo del año en que hubieren de celebrarse las elecciones, envía el Superintendente General de Elecciones a los presidentes de las juntas locales de elecciones. De conformidad con la sección 27 de la Ley Electoral, los presidentes de las juntas locales de elecciones fijarán una copia de esas listas al público en sitio visible, accesible y protegido en la entrada a las oficinas de las juntas locales respectivas. Además de estas listas que se envían a los presidentes de las juntas locales, la misma sección 27 provee que en igual fecha se enviarán otras copias de ellas a los presidentes de las secciones y comités locales correspondientes de los partidos políticos principales. Cualquier elector que tenga interés en hacer uso de su derecho al voto, tiene fácil oportunidad desde el 31 de marzo del año de las elecciones en adelante, a enterarse por las listas que se exhiben al público o por las del comité local de su partido en el precinto de su residencia, si su nombre ha sido o no incluído en las listas de electores inscritos. De no aparecer en dichas listas puede establecer el recurso que corresponda para lograr su inclusión, si es que tiene derecho a ello. ¿Y qué menos se puede exigir a un ciudadano cuya petición de inscripción no reúne los requisitos de ley?

Para que la debida notificación exista no es indispensable en todo caso que ésta sea personal, con mucha más razón cuando el número de personas a ser notificadas sea tan numeroso como en el presente caso. Sostener que la notificación en la forma indicada, es decir, por la fijación de las listas en sitios accesibles al público, impone al ciudadano una obligación que él no viene obligado a cumplir, es una frívola contención. Frecuentemnete se dan avisos o se hacen notifi-

caciones por medio de la prensa, y esa notificación no deja de ser válida por el mero hecho de que para enterarse de ella el perjudicado tenga que comprar o adquirir en otra forma el diario que la publica.

■ Pasando ahora a la contención de que es éste un pleito de clase, demostrado que la Junta tiene la facultad de pasar sobre la suficiencia en la forma de las peticiones de inscripción, fácil es concluir que el presente no es un pleito de clase, pues no existe en él una cuestión común de derecho entre David Benjamín Cruz y las 85,018 personas restantes cuyas peticiones de inscripción se niega la Junta Insular a pasar al libro registro de electores. Ya hemos visto que el defecto de que adolece la petición de inscripción, o sea el no aparecer en ella la firma del miembro de la junta que debió autorizar el juramento de David Benjamín Cruz, no es un defecto común a las demás peticiones. Además, un documento que se pretende ha sido jurado, donde el *jurat* no contiene la firma del funcionario que debió autorizar el juramento, conlleva la presunción de que no ha existido tal juramento, incumbiendo al que alegue su existencia refutar la presunción probando que el juramento fué en realidad prestado. En el presente caso David Benjamín Cruz no controvirtió esa presunción, pues en su declaración ante este tribunal manifestó que no recordaba haber prestado tal juramento.

■ Se arguye que al reconocer nosotros el poder que a nuestro juicio tiene la Junta Insular para negarse a incluir en el libro registro de electores los nombres de las personas cuyas peticiones de inscripción no reúnen los requisitos de ley, equivale a concederle una facultad tan vasta que en cualquier momento podría la Junta Insular caprichosamente eliminar de las listas antiguos electores, de ese modo alterando el resultado de una elección.

Ese argumento pierde de vista que el artículo 102 de la Ley de Evidencia, apartado quince, prescribe que existe la

presunción de que los deberes de un cargo han sido cumplidos con regularidad. Es muy poco persuasivo el argumento que para impugnar la interpretación de un estatuto tiene por base imaginar un caso tan extremo y tan improbable como lo es el de que un funcionario pueda cometer un fraude en el cumplimiento de un deber oficial que ha jurado cumplir de acuerdo con la ley. Si tal caso ocurriera, procedería un mandamus para obligar a la Junta a restablecer esos electores en las listas, aparte de las severas penalidades en que los miembros de la Junta pudieran incurrir. Véase McCrary *on Elections,* cuarta edición, sección 135, página 102.

■ Es regla bien establecida que el recurso de mandamus no procede a menos que el que lo invoque tenga un derecho claro y diáfano al remedio que solicita. En el presente caso no vemos que las 85,019 personas cuyas peticiones de inscripción no cumplen con los requisitos exigidos por la ley, tengan un derecho claro y diáfano a que sus nombres sean incluídos en el libro registro de electores.

■ Por último, el hecho de que el Superintendente General de Elecciones se allane a incluir en las listas provisionales los nombres de las 85,019 personas en cuestión, no afecta la resolución de este caso, puesto que el Superintendente General de Elecciones es un miembro de la Junta Insular cuyo deber ministerial de preparar las listas provisionales depende de que la Junta Insular haya dispuesto que los nombres de personas que deban figurar en las listas provisionales sean previamente incluídos en el libro registro de electores.

*Por lo expuesto, procede a nuestro juicio denegar la expedición de los autos perentorios de mandamus.*

OPINIÓN CONCURRENTE DEL JUEZ PRESIDENTE SEÑOR TRAVIESO

Marzo 29, 1944

Estoy enteramente de acuerdo con la opinión emitida por el Juez Asociado Sr. De Jesús y creo como él que no procede

expedir el auto de *mandamus* que se solicita. Su expedición
en un caso como el presente equivaldría a declarar que las
disposiciones mandatorias de las secciones 16, 17, 18 y 19 de
la Ley de Inscripciones, en cuanto a los requisitos que deberá
cumplir todo elector que desee inscribirse, nada significan;
que una petición de inscripción que se ajusta estrictamente
a lo dispuesto en dichas secciones tiene el mismo valor y
fuerza legal que otra que no ha sido firmada por el peticio-
nario o por el testigo o por ninguno de los dos o que no
ha sido jurada ni por el peticionario ni por el testigo ante
miembro alguno de la junta de inscripciones; y que las facul-
tades que la Ley de Inscripciones confiere a la Junta Insular
de Elecciones para inspeccionar y dirigir las inscripciones
de nuevos electores en Puerto Rico, nada significan, siendo
la única función de dicho organismo la de recibir las peti-
ciones de inscripción, en cualquier forma en que las mismas
hayan sido otorgadas, y pasarlas al Superintendente General
de Elecciones para formar con ellas el registro de electores.

No es posible aceptar que el mismo legislador que ex-
presó claramente su deseo de que las inscripciones se lleven
a cabo pacíficamente y de acuerdo con la ley y que con ese
mismo alto propósito confirió a la Junta Insular de Eleccio-
nes las facultades necesarias para inspeccionar y dirigir esas
inscripciones, tuviese en mente la idea de que el mejor modo
de inspeccionar y dirigir unas inscripciones es cerrar los
ojos ante las más flagrantes violaciones de la ley y dar a
cualquier documento que llegue ante la Junta, aún cuando
en el mismo falten las firmas y el juramento requeridos por
la ley, igual trato y consideración que a una petición de ins-
cripción que prima facie se ajuste a los requisitos del estatuto.

Cuando la petición de inscripción cumple prima facie
con todos los requisitos legales y no ha sido protestada, la
Junta Insular de Elecciones y el Superintendente General
de Elecciones tienen el deber ministerial de darle curso,
inscribiendo el nombre del peticionario en la lista o registro

de electores. Ni la Junta ni el Superintendente estarían autorizados para negarse a dar curso a una petición así otorgada, aún cuando se hiciera contra ella una imputación de fraude, pues la determinación de si hubo o no hubo fraude en su otorgamiento es una función judicial fuera de la jurisdicción de la Junta Insular y de la del Superintendente. Empero, cuando en contravención de lo dispuesto taxativamente en la ley, en la alegada petición de inscripción no aparece la firma del peticionario ni la del testigo, o cuando por la falta de la firma del funcionario que tomó o debió tomar el juramento, surge la presunción de que el juramento requerido por la sección 19 de la Ley de Inscripciones nunca fué prestado, la Junta y el Superintendente tienen el deber ministerial de rechazar el documento y de negarse a tratarlo y considerarlo como una petición de inscripción. Y al hacerlo así no están ejerciendo función judicial alguna, como no la ejerce el cajero de un banco que rehusa pagar un cheque en el que no aparece la firma del librador, aún cuando su nombre aparezca impreso al margen del cheque. Una alegada petición de inscripción que no está firmada, o que estando firmada presuntivamente no ha sido jurada por el peticionario, no es la petición de inscripción que da derecho a que se inscriba el nombre de un elector en el registro oficial de electores.

El derecho al voto, como todos los derechos humanos de carácter político, tiene que someterse necesariamente a las reglas razonables que el poder legislativo ha creído prudente promulgar para proteger su ejercicio. El sufragio se convertiría en una farsa y en un grave peligro para las instituciones democráticas, si todos los ciudadanos, incluyendo los legalmente incapacitados, pudieran ejercitarlo sin someterse a las restricciones y requisitos legales. El propósito fundamental de la Ley de Inscripciones—garantizar hasta donde sea humanamente posible unas elecciones honradas, preparando de antemano un registro de electores legalmente capa-

citados—quedaría burlado, si la Junta Insular de Elecciones se viese obligada a incluir en el registro los nombres de miles de supuestos electores, a base de documentos que por sí mismos demuestran, no un cumplimiento parcial o imperfecto de la ley y sí el más absoluto incumplimiento de uno o más de los requisitos esenciales que de acuerdo con la ley debe cumplir toda persona que desee que su nombre sea incluído en el registro de electores. Ni la ignorancia de la ley, ni el incumplimiento o desobediencia de sus preceptos, pueden ser invocados como base para la reclamación de un derecho. Si sostuviéramos lo contrario, introduciríamos el caos en nuestro sistema electoral y abriríamos de par en par las puertas al fraude.

Convenimos con los peticionarios en que cada uno de ellos tiene el derecho individual de controvertir la presunción de que su petición no fué jurada, como lo requiere la ley, o de exponer las razones, si algunas tuviere, por las cuales la petición no fué firmada por él o por el testigo de identificación. Si el elector peticionario en realidad prestó el juramento de ley, la negligencia del funcionario que administró el juramento no debe ser considerada como causa suficiente para privar al peticionario de su derecho al voto. Es al peticionario que presuntivamente dejó de cumplir la ley a quien corresponde controvertir la presunción, recurriendo a los tribunales de justicia para la protección de su derecho. Mientras la presunción de incumplimiento esté en pie, la Junta Insular de Elecciones debe abstenerse de practicar la inscripción.

La evidencia practicada durante el curso de este procedimiento demuestra claramente que existe un defecto fundamental en nuestra Ley de Inscripciones. El término fijado para la inscripción de nuevos electores—prácticamente medio día para los hombres y medio día para las mujeres—es sumamente corto. No vemos razón alguna que justifique esa irrazonable limitación y que impida que se fije, como se ha

hecho en la mayoría de los Estados de la Unión, un término suficientemente amplio, en algunos casos de varios meses con anterioridad a las elecciones, para que las inscripciones puedan verificarse cómodamente y sin esa festinación que parece haber sido la causa principal del gran número de peticiones incompletas que han aparecido en las últimas inscripciones.

La expedición del mandamus solicitado no es el remedio adecuado para resolver la situación que se ha presentado a la consideración de esta Corte Suprema. Las deficiencias en la Ley de Inscripciones deben ser corregidas por la Asamblea Legislativa. El elector que crea que su nombre ha sido ilegalmente excluído del registro de electores puede recurrir a los tribunales competentes en demanda de protección para su derecho individual como elector.

Opinión emitida por el Juez Asociado Señor Todd, Jr.

Después de haber considerado detenida y cuidadosamente las alegaciones de las partes y la prueba presentada por ellas, somos de opinión que este caso sólo presenta una cuestión fundamental, a saber: ¿Tiene la Junta Insular de Elecciones poder para cancelar peticiones de inscripción que no fueron protestadas ante las Juntas de Inscripciones que actuaron durante los días 15 y 16 de enero de 1944?

Alegando que la Junta Insular de Elecciones carece de autoridad para aprobar ciertas reglas que tienden a reconocerle dicho poder, los peticionarios han solicitado de esta corte que expida un auto perentorio de *mandamus* dirigido a dicha Junta y al Superintendente de Elecciones para que procedan a incluir en las listas y libros de registro de electores los nombres de 85,019 electores que se inscribieron en las inscripciones celebradas en los días mencionados.

El Superintendente de Elecciones se allanó a la petición. La Junta Insular de Elecciones, representada por una mayoría de sus miembros se ha opuesto y asimismo, el Partido

Unión Republicana cuya intervención se admitió por la Corte. Ambos alegan que, haciendo caso omiso de las reglas a que se refiere la petición, la Junta Insular de Elecciones tiene dicho poder de acuerdo con la Ley de Inscripciones de 1939 (Ley núm. 19 de 10 de junio de 1939) y la Ley Electoral vigente. Sostienen, además, que el litigio de clase es improcedente en este caso porque no existe "comunidad de interés" entre el peticionario David Benjamín Cruz y sus representados.

█ En cuanto a esta última cuestión nos bastará con decir que si la Junta Insular de Elecciones carece de poder para cancelar inscripciones de electores, es obvio que entre el peticionario David Benjamín Cruz y sus representados existe una "cuestión común de derecho' que afecta "los distintos derechos" y, por tanto, puede solicitar un *"remedio común"*, según se provee en la Regla 23(*a*)(3) de las Reglas de Enjuiciamiento Civil aprobadas por esta Corte Suprema. Véanse 30 Michigan Law Review 878; 30 Cal. Law Review 350; 19 Cornell Law Quarterly 399; *Weeks* v. *Bareco Oil Co.,* 125 F. (2d) 84, y *Cf. Rivera* v. *Tugwell, Gobernador,* 59 D.P.R. 841.

██ No creemos propio, dada la conclusión a que hemos llegado, entrar a considerar y resolver las demás cuestiones legales planteadas por las partes. La cuestión primordial envuelta es una de jurisdicción y ante ella carecen, por el momento, de importancia todas las demás. Está envuelta, además, en dicha cuestión jurisdiccional, y de su resolución depende, si 85,019 personas que, presuntivamente quedaron inscritas como electores, por no haber sido protestadas bajo juramento sus peticiones, pueden ser excluídas de las listas provisionales o definitivas de electores, sin ser oídas, y debe imponérseles la obligación de ser ellas quienes ejerciten acciones independientes o conjuntas, para obtener que sus nombres sean incluídos en dichas listas.

Los demandados al anunciar la teoría de su caso el día de la vista, expresamente hicieron constar que la actuación

que en su día pueda tomar la Junta Insular de Elecciones está autorizada por Ley. En su alegato escrito se limitan a especificar los requisitos que exige la Ley de Inscripciones a ser cumplidos por los que pretendan inscribirse y por los funcionarios de las Juntas de Inscripciones. No han citado los demandados disposición alguna de la ley que expresamente autorice a la Junta Insular de Elecciones a cancelar una petición de inscripción que no ha sido protestada. Tanto por las alegaciones como por la prueba es un hecho admitido y probado que en las 85,019 peticiones de inscripción existen distintas omisiones, defectos, errores e irregularidades. Empero, esas mismas omisiones, defectos, errores e irregularidades existían en dichas peticiones los días 15 y 16 de enero de 1944 cuando las Juntas de Inscripciones declararon terminadas las inscripciones y enviaron dichas peticiones, sin protesta alguna, a la Junta Insular de Elecciones. ¿Puede la Junta Insular de Elecciones discrecionalmente y ejercitando un poder implícito, negarse a incluir dichas peticiones en las listas de electores o tiene por el contrario el Superintendente General de Elecciones y la Junta el deber ministerial de incluirlas? Veamos la ley primero, en tanto en cuanto ella se refiere a la Junta Insular de Elecciones y luego en términos generales.

La sección 1 de la Ley de Inscripciones de 1939 expresa el propósito de la misma diciendo:

"Sección 1.—El propósito de esta Ley es establecer un nuevo sistema de *inscripción* de electores, sin necesidad de derogar totalmente la 'Ley Electoral' de Puerto Rico, y la presente se entenderá que es enmendatoria de la referida 'Ley Electoral' de Puerto Rico, en todo lo que se relacione con la *inscripción* de electores, *y nada más.*" (Bastardillas nuestras.)

La sección 4 limita expresamente la intervención de la Junta Insular de Elecciones en las inscripciones a *"la inspección y dirección* de las inscripciones en Puerto Rico . . ."

Por la sección 5 se le ordena a dicha Junta para que proceda "a agrupar o dividir los diferentes barrios urbanos

o rurales de cada precinto en colegios de inscripción'' de acuerdo con el resultado de las elecciones generales anteriores. Aun cuando por la sección 6 se autoriza a la Junta Insular de Elecciones a nombrar ''tantas Juntas de Inscripciones para la *inscripción* de electores para cada precinto como colegios hubiere en el mismo,'' lo cierto es que estas Juntas de Inscripción no son nombradas por la Junta sino, según provee la misma sección, por el Superintendente General de Elecciones a propuesta, cada miembro, por el órgano director central o local del partido que represente. Es al ocurrir una vacante en dichas juntas que la Junta Insular provee la forma de cubrirla ''siempre teniendo en cuenta que el sustituto deberá pertenecer al mismo partido'' del que ocasionó la vacante.

Por la sección 8 la Junta Insular, en todo año de elecciones, mediante resolución aprobada por el Gobernador de Puerto Rico, debe fijar un sábado para la *inscripción* de electores mujeres y el día siguiente para la *inscripción* de electores varones. Y dice entonces esta sección que ''en dichos días se llevarán a cabo *inscripciones* en toda la Isla de Puerto Rico con el fin de que se hagan las *inscripciones* de aquellas personas que no estuvieren *debidamente inscritas como electores, y legalmente tuvieren derecho a la inscripción,* y de aquéllos que, estando inscritos, hubieren establecido su domicilio en el respectivo precinto con un año de anterioridad al día que se celebren las elecciones. La *inscripción* comenzará a la una de la tarde . . . y continuará hasta que se haya *inscrito* todo elector presente en el colegio respectivo.''

La sección 11, a su final, dispone que ''La Junta Insular de Elecciones queda autorizada para dictar aquellas reglas y resoluciones que *garanticen y aseguren para el elector la inscripción que por esta Ley se provee.''* .

Y, por la sección 25, se autoriza a la Junta Insular de Elecciones para que, de tiempo en tiempo, dicte reglas con-

ducentes *"a llevar a cabo inscripciones pacíficas y legales y podrá llevar a cabo el trabajo de preparación y supervisión de dichas inscripciones a través de las juntas locales de elecciones . . ."*

Por último, la sección 31 declara expresamente que "todas aquellas disposiciones de la referida Ley Electoral que no están en conflicto con las disposiciones de ésta, *podrán* ser aplicadas por la Junta Insular de Elecciones, siempre que fuere necesario, *para llevar a cabo unas inscripciones pacíficas y legales."* (Todas las bastardillas nuestras.)

Revisadas, sucintamente, todas las disposiciones de la Ley de Inscripciones que se refieren a la Junta Insular de Elecciones, debemos, de acuerdo con la sección 31 que acabamos de citar, revisar también la Ley Electoral vigente, para ver si en ella hay alguna disposición que autorice a la Junta Insular de Elecciones a actuar en relación con la inscripción de electores.

Las únicas secciones son la 25 y la 31, las cuales, en lo pertinente, copiamos al margen.([1])

([1]) "Sección 25.—La Junta Insular de Elecciones *llevará un libro de registro de electores,* separadamente para cada precinto, haciéndose constar en él, por barrios y por orden alfabético de apellidos, *con arreglo a las fechas de sus respectivas inscripciones,* el nombre, edad, color y dirección *de toda persona inscrita como elector con la fecha de su inscripción,* y si fuere posteriormente excluído y reinscrito, la fecha y motivo de su exclusión, y la fecha y motivo de su reinscripción.

"También se llevará un *archivo,* clasificado por municipios, precintos y barrios, por orden alfabético, *de todas las peticiones de inscripción,* cada una de las cuales *llevará adjunto el original del certificado de inscripción correspondiente a la misma,* así como los documentos que se refieren a la exclusión y reinscripción del mismo elector, si los hubiere, de modo que los documentos de este archivo sirvan *para la comprobación de los asientos del registro."*

     *    *    *    *    *    *

"Sección 31.—El Superintendente General de Elecciones examinará e investigará todas las peticiones para la exclusión de inscripciones que él reciba durante el tiempo que esta Ley requiere, y notificará por correo enviándoles copias de la recusación a las personas cuyas inscripciones sean o puedan ser recusadas para presentar evidencia en forma de contra-affidavits con el fin de mantener la legalidad de sus inscripciones, entendiéndose que la prueba del envío de dicho aviso por correo será la evidencia incontrovertible de tal extremo, *y si se demuestra a satisfacción de la Junta Insular de Elecciones por la prueba*

Somos de opinión que ninguna de las disposiciones contenidas en estas leyes concede a la Junta Insular de Elecciones poder alguno para que, actuando como organismo apelativo, resuelva, sin dar oportunidad alguna al elector cuya petición ante las Juntas de Inscripción no fué protestada, que su nombre no debe ser incluído en las listas y libro de registro de electores e inscritos.([2]) Una mera lectura de la sección 31, supra, demuestra que, en el único caso específico en que se autoriza la exclusión de electores inscritos, el Superintendente de Elecciones tiene que notificar al interesado para que pueda presentar evidencia y luego se le concede una apelación judicial. Es decir, al inscrito se le oye y tiene su día en corte.

La intención legislativa de que el derecho al voto que le reconoce la Carta Orgánica y la Ley Electoral a los electores capacitados de Puerto Rico no sea eliminado sin el debido procedimiento de ley, está claramente expresado tanto en la Ley de Inscripciones como en la Ley Electoral. Veamos, también en detalle sucinto, lo que dichas leyes proveen al efecto.

La Ley de Inscripciones en su sección 7 dispone que las facultades de la Junta de Inscripciones son "meramente administrativas, o sea para recibir e investigar las peticiones de inscripción, tomar juramento de las mismas a los electores, diligenciar las protestas de las inscripciones mediante constancia del hecho al dorso de la *inscripción y remitir al juez de la corte municipal o de paz . . . las inscripciones protestadas, y dicho juez decidirá mediante vista pública, sobre*

sometida en esos casos, tal como anteriormente se autoriza por esta Ley, que es ilegal la inscripción contra la cual se ha hecho y presentado una petición de exclusión, el Superintendente General de Elecciones, deberá, si se le ordena por dicha junta, cancelar inmediatamente tal inscripción." (Bastardillas nuestras.)

([2]) Es conveniente hacer notar, para evitar cualquier confusión, que la intervención que por la Sección 31 se da a la Junta Insular se refiere únicamente al procedimiento de exclusión de electores que figuren en las listas provisionales de inscripciones y electores nuevamente inscritos, provisto por las secciones 29 y 30 de la Ley Electoral, disponiéndose en la Sección 32 el derecho de apelación correspondiente para ante las cortes.

*los méritos de la inscripción o protesta, aceptándola o dene-
gándola."* (Bartardillas nuestras.) Después se provee que
las decisiones de dichos jueces serán apelables para ante las
cortes de distrito correspondientes y las de estas cortes serán
revisables mediante *certiorari* por esta Corte Suprema.

La sección 10 de la misma ley dispone quiénes pueden
protestar la *inscripción* del elector y de nuevo repite el pro-
cedimiento a seguirse.(³) Y la sección 11 provee que al
elector cuya inscripción ha sido protestada se le entregará
uno de los duplicados haciéndose constar al dorso de la
petición el hecho de haber sido protestada y también impone
a la corte que haya dictado decisión final resolviendo que la
inscripción es legal, el deber de expedir al elector un certi-
ficado de tal hecho.

Las secciones 13 y 15 proveen para la corrección de cual-
quier petición que se haya hecho erróneamente o para que
al elector se le haga una nueva antes de abandonar el cole-
gio el mismo día de las inscripciones.

Tenemos, por lo tanto, en la Ley de Inscripciones, un
procedimiento claro y conciso, no sólo en cuanto a la forma
de protestar una inscripción y quién puede hacerla, sino que
también en cuanto a la intervención judicial, desde las cor-
tes de paz hasta la Corte Suprema, en la determinación de
la legalidad de una inscripción.

---

(³) "Sección 10.—La junta de inscripciones o cualquiera de sus miembros
podrá investigar la verdad del contenido de la petición quedando autorizada
para protestar la inscripción del elector haciéndolo así constar al dorso de las
mismas bajo su firma y el mismo juramento que prestó para ejercer su cargo.
Estas peticiones así protestadas se trasmitirán a la corte municipal o de paz
del respectivo municipio, para ser reconsideradas las inscripciones, debiendo ci-
tarse al elector y al recusador para la vista de la recusación, los que podrán
aportar las pruebas correspondientes. Si la corte estimare que la inscripción es
ilegal decretará la anulación de la misma, y si la recusación hubiere sido vi-
ciosa, condenará a la persona que la hubiere hecho a sesenta días de cárcel por
cada recusación y le privará del derecho al voto por dos elecciones consecutivas,
ordenando su eliminación de las listas electorales. Las decisiones finales de las
cortes en esta materia, se verificarán a más tardar en el mes de junio del año
de las elecciones."

La sección 30 de la Ley Electoral provee otros medios para obtener la exclusión de electores de las listas provisionales de inscripciones, y ya hemos citado la sección 31 que provee el procedimiento a seguirse ante el Superintendente de Elecciones. Aun cuando la Junta Insular le ordene al Superintendente cancelar una inscripción, en este procedimiento especial, la sección 32 expresamente dispone que el interesado "podrá apelar de la resolución de dicha junta ante la corte municipal del municipio a que correspondiere dicha lista de inscripciones" o ante la corte de paz si no existe corte municipal en el municipio. Ante dichas cortes al interesado se le da amplia oportunidad de presentar prueba pues se faculta a las mismas para "citar y oír testigos y para exigir y examinar los documentos y pruebas que fueren pertinentes para poder llegar a una determinación sobre los hechos y la ley en esos casos."

De suma importancia consideramos, además, el tercer párrafo de la sección 61($d$) de la Ley Electoral que, en lo pertinente, textualmente dice:

"En caso de que apareciere ilegalmente incluído en las listas electorales un elector que no tuviere las debidas cualificaciones de acuerdo con la ley para votar en unas elecciones, cualquier otro elector podrá solicitar de la corte de distrito de su domicilio que dicho elector sea eliminado de las listas electorales y la corte así lo hará, debiendo estas solicitudes hacerse antes del día 15 de septiembre del año de elecciones y las cortes de distrito dictar sentencia a más tardar el 30 de septiembre del mismo año; . . ."

Tenemos, además, que la sección 61($c$) dispone que "cualquier inspector, recusador o *elector* dentro de un colegio, podrá recusar a un votante antes de que éste deposite su voto" aunque la recusación no impedirá que el elector vote, y la sección 70 dispone que "si un recusador tuviere razones para suponer que alguna persona está *votando ilegalmente,* podrá recusar el voto de dicha persona *por cualquier motivo que hiciere ilegal dicho voto a virtud de las disposiciones de esta Ley,* pero dicha recusación no impedirá

que ·dicha persona vote.'' (Bastardillas nuestras.) Se provee entonces la forma de las recusaciones, que deben ser juradas.

Por último, la sección 70(a) dispone, en lo pertinente, que:

''. . . Si posteriormente a unas elecciones se demostrare por una corte competente que una papeleta recusada fué votada por un elector sin derecho a votar en esas elecciones por no poseer los requisitos que fija la ley para poder votar, la corte podrá ordenar la anulación de su voto y ordenará, además, a la Junta Insular de Elecciones a rectificar el informe del escrutinio correspondiente, a los fines de dar cumplimiento a las disposiciones de la sección 91 de la presente Ley.'' (4)

Las secciones 71(a) y 72 proveen las penalidades para todo recusador que recusare el voto de un elector legal sin tener razón para creer que el elector está votando ilegalmente y para todo elector que votare o intentare votar ilegalmente.

El cuadro que presentan todas estas disposiciones de ley demuestran que la Legislatura de Puerto Rico tuvo buen cuidado de proveer los remedios legales adecuados para que se pueda obtener, *antes del día de las elecciones,* que se eliminen de las listas electorales los nombres de todas aquellas personas que estuvieren, por cualquier motivo, ilegalmente inscritas. Estos remedios son: 1, el procedimiento de protestas iniciado por las Juntas de Inscripción y apelable a las cortes (Secciones 7 y 10, Ley de Inscripciones) ; 2, el procedimiento de recusación y exclusión iniciado por cualquier elector ante el Superintendente de Elecciones, resuelto por la Junta Insular de Elecciones y apelable a las cortes (Secciones 30, 31 y 32 Ley Electoral), y 3, la acción ordinaria iniciada en una corte de distrito por cualquier elector (Sección 61 (d) Ley Electoral). Demuestra, además, que, *el mismo día de las elecciones,* si dichas personas no

---

(4) ''Sección 91.—La Junta Insular de Elecciones dará cuenta al Gobernador del resultado · de las elecciones y el Gobernador declarará a la persona que reciba el mayor número de votos para cada cargo debidamente electa, y expedirá un certificado de elección en debida forma a dicha persona.''

han sido eliminadas de las listas, pueden ser recusadas al votar, bien por otro elector o por un recusador (Secciones 61(c) y 70 Ley Electoral) y, por último, que aun *después de las elecciones,* los votos de dichas personas pueden ser anulados por las cortes (Sección 70 (*a*) Ley Electoral).

Ante esta situación legal, resolvemos que el poder de la Junta Insular de Elecciones en cuanto a cancelación de inscripciones, está limitado por la sección 31 de la Ley Electoral, supra, y cumpliendo el procedimiento allí provisto, a ordenar al Superintendente de Elecciones que cancele aquellas inscripciones ilegales contra las cuales se ha hecho y presentado una petición de exclusión, y aún en dichos casos los interesados pueden apelar para ante las cortes. (Sección 32, Ley Electoral.)

La cancelación de una inscripción, como lo demostró la prueba presentada en este caso, depende en cada caso de la adecuada determinación de distintas cuestiones de hecho y de derecho. Es una función claramente judicial. Tomemos, como ejemplo, las 50,140 peticiones, incluídas entre las 85,019 objeto de este recurso, en las cuales se alega que los peticionarios no juraron sus peticiones por el hecho de que no aparece la firma del miembro de la Junta de Inscripciones que tomó dicho juramento. No tenemos duda de que la ausencia de dicha firma en el *jurat* levanta una *presunción* de que el juramento no fué prestado en dichos casos. ¿Quiere esto decir, sin embargo, que los 50,140 peticionarios no prestaron dicho juramento y que debe privárseles del derecho al voto eliminando sus nombres de las listas electorales sin dárseles una oportunidad de ser oídos? Tratar de interpretar la ley en ese sentido sería un absurdo. No sólo la prueba presentada en este caso demostró que esa presunción puede ser destruída, sino que la jurisprudencia sostiene que esa prueba es admisible.

En el caso de *Cusick's Election,* 136 Pa. 459, 20 Atl. 574, (1890), se resolvió que la ausencia de un *jurat* levanta una

presunción de que el juramento no fué tomado, pero que dicha presunción podía ser refutada por prueba de que en efecto fué administrado. La corte dijo:

"¿Por qué debe el elector perder su voto por la *negligencia* del funcionario de la ley de hacer constar el *jurat?* Tal equivocación puede haber sido *no sólo inocente, sino que es probable que ocurra en un colegio aglomerado* (crowded), *especialmente en vista del hecho de que los funcionarios electorales, en muchas ocasiones, no tienen experiencia."* (Bastardillas nuestras.)

No hemos de citar más casos sobre esta cuestión específica. Para otros sosteniendo la misma doctrina, véanse las monografías en 1 A.L.R. 1568 y 116 A.L.R. 587. Empero, el caso de *Cusick,* supra, demuestra que los hechos que la prueba, tanto de los peticionarios como la de los demandados en el caso de autos, evidenció, no ocurren sólo en Puerto Rico en el año 1944 sino que otros similares también ocurrían en Pennsylvania en el año 1890.

La determinación de lo que en realidad ocurrió en cada caso específico de esos 50,140, no es función que compete a la Junta Insular. Es una de carácter judicial. *Cf. Roca* v. *Junta Insular de Elecciones,* 35 D.P.R. 642, en el cual en relación no ya con unas inscripciones sino con unas elecciones, resolvimos que "Cuando existe fraude, *cuando se cometen errores fundamentales de ley,* no es la Junta Insular, sino las cortes de justicia de acuerdo con todos los precedentes, las llamadas a resolver los casos." (Bastardillas nuestras.)

Es cierto que también se alega que existen, entre las 85,019 peticiones atacadas, 365 que no aparecen firmadas por los peticionarios y otras 5450 en las cuales, no sabiendo los peticionarios escribir, no tienen la firma del testigo de identificación, y se sostiene que en cuanto a éstos no puede haber duda de que no ha existido inscripción alguna. Consideramos que, al igual que las demás omisiones, defectos y errores contenidos en los distintos grupos detallados en el *Exhibit*

1 de los peticionarios, corresponde a las cortes de justicia resolver sobre la legalidad de dichas inscripciones. *Cf. Funkhouser* v. *Lanfried,* 22 S.E. (2d) 353.

En el caso de *Pierce* v. *Superior Court,* 1 Cal. (2d) 759, se inició por el Procurador General un procedimiento a nombre del Estado de California en contra de 24,000 electores inscritos, con el fin de cancelar sus inscripciones. Aun cuando no existía estatuto alguno autorizando el procedimiento, la Corte Suprema resolvió que "El derecho del Estado de proceder en equidad . . . para purgar el 'gran registro' de inscripciones fraudulentas no puede ser cuestionado seriamente. Es una de las altas prerrogativas del Estado proveer y asegurar unas elecciones honradas." Dicho procedimiento fué reconocido a pesar de existir en California el artículo 1109 del Código Político autorizando acciones similares por "cualquier persona". Esto no obstante, la corte expidió un auto inhibitorio prohibiendo la continuación del procedimiento en la corte inferior por haberse demostrado que los 24,000 electores no habían sido emplazados.

Asumiendo, sin resolverlo, que El Pueblo de Puerto Rico representado por el Procurador General pueda iniciar un procedimiento similar ante las cortes competentes, ésa sería otra forma de obtener la cancelación de inscripciones ilegales. Pero aun en un caso de esa naturaleza siempre habría que cumplir con el requisito previo de citar y oír a los interesados. Como se dice en el caso de *Pierce,* supra: "Antes que el derecho al voto pueda ser denegado a un individuo debe notificársele y dársele la oportunidad de ser oído en la forma provista por ley."

La cancelación por la Junta Insular de Elecciones de las 85,019 peticiones envueltas en el caso de autos, privaría a 85,019 personas, presuntivamente cualificadas, de su derecho al voto. Nada hemos encontrado en la ley que autorice a la Junta Insular de Elecciones a actuar como un tribunal

apelativo de las juntas de inscripciones y a ejercitar funciones judiciales. Si la ley le concediera dicho poder, sin proveer la debida citación y audiencia de los interesados, sería nula. Más claramente lo sería, de prevalecer la contención de los demandados. Por el contrario, la ley provee amplias salvaguardias para que, si en efecto esos 85,019 inscritos no tienen derecho a figurar en las listas electorales y, por tanto, a votar, sus nombres puedan ser excluídos de dichas listas, antes de las elecciones, y aun después de celebradas éstas, que sus votos sean anulados.

La sección 27 de la Ley Electoral impone al Superintendente General de Elecciones el deber, que consideramos ministerial, de "preparar una lista para cada precinto . . . de los electores nuevamente inscritos" y de enviar copias no más tarde del 31 de marzo del año en que se celebren elecciones, a los presidentes de la junta local de elecciones y a los presidentes de los partidos políticos principales. La sección 25 de la misma ley, supra, impone a la Junta Insular de Elecciones el deber, que también consideramos ministerial, de llevar, además de un libro registro de electores, un archivo de las peticiones de inscripción. El Superintendente General de Elecciones se ha allanado a cumplir dicho deber, pero no así la Junta Insular. Debe, por tanto expedirse el auto de mandamus perentorio solicitado.

Hasta aquí la ponencia que no mereció la aprobación de una mayoría del tribunal. La división, por empate en la votación de sus jueces, trae como consecuencia que una cuestión de tanta importancia y trascendencia como la envuelta en este caso, quede sin resolver afirmativamente en una u otra forma. Porque, aun cuando la Junta Insular de Elecciones podrá ahora actuar en la forma que desee, no es porque una mayoría de este tribunal así lo haya resuelto, sino porque se necesita una mayoría para impedir que actúe, a nuestro juicio, ilegalmente. Empero, el efecto de esta división y el reconocimiento que la opinión contraria hace

de poderes implícitos en la Junta, es igual a que se hubiera denegado el auto en sus méritos por mayoría del tribunal.

La trascendencia del precedente que se pretende establecer reconociendo poderes implícitos a la Junta Insular de Elecciones hace necesario algunos comentarios adicionales de nuestra parte en relación con la opinión del Juez Asociado Sr. De Jesús.

En primer término, aun cuando la Junta Insular de Elecciones, tanto en su contestación como al exponer la teoría de su caso en la vista oral, sostuvo que era la propia ley la que le daba el poder para actuar y no las reglas por ella aprobadas, se sostiene en dicha opinión que la Junta tiene dicho poder porque las secciones 4 y 25 de la Ley de Inscripciones le confieren la facultad de aprobar reglas para llevar a cabo las disposiciones de la ley y especialmente inscripciones pacíficas y legales, y además porque la Junta Insular aprobó otras reglas en el año 1940, después de las inscripciones, con el fin de corregir errores en las peticiones de aquel año. En cuanto a estas reglas aprobadas por una junta en la cual no tenían voz ni voto los aquí demandantes, no puede sostenerse que les obligue a reconocer la validez de la actuación de la actual Junta y tampoco está obligado este Tribunal a resolver el presente caso reconociendo a dicho organismo un poder que la ley no le concede, por el hecho de que en el pasado lo haya ejercitado ilegalmente.

El poder que le concede la ley a la Junta Insular de Elecciones para aprobar reglas, es sencillamente con el fin de *llevar a cabo* inscripciones pacíficas y legales. Se refiere, a nuestro juicio, al período que la misma ley señala para dichas inscripciones, y que, en este caso, terminó en los días 15 y 16 de enero. Que esto es así lo demuestra la última oración de la sección 11, que ya hemos citado anteriormente, y a virtud de la cual la Junta Insular queda autorizada para dictar aquellas reglas y resoluciones que *garanticen y aseguren para el elector* la inscripción que por la ley se concede.

Sostener que ese poder incluye, implícitamente, el de cancelar peticiones de inscripción, nos parece un absurdo. Si la Legislatura de Puerto Rico hubiera tenido la intención de conceder una facultad tan amplia a la Junta Insular, expresamente lo hubiera hecho constar, y además, hubiera concedido al elector el recurso de apelación para ante las cortes de justicia, al igual que lo hizo en los casos de peticiones protestadas y recusadas. Reconocerle este poder implícito a la Junta Insular es convertirla en el tribunal más poderoso de Puerto Rico. Sin tener que cumplir con ningún requisito previo de notificación al interesado; sin concedérsele una vista para tener la oportunidad de defender la legalidad de su inscripción, y, por último, sin que en ninguna forma se le notifique personalmente la decisión de la Junta cancelando su inscripción, es decir, sin cumplirse con los más rudimentarios elementos de un debido procedimiento de ley, se le privará del derecho al sufragio.

No está de más hacer constar aquí que el sufragio es un derecho concedido por nuestra Carta Orgánica a los ciudadanos de los Estados Unidos que hayan cumplido 21 años de edad y que tengan las demás condiciones prescritas por la Legislatura de Puerto Rico. Es en el sentido de que los ciudadanos mayores de 21 años reúnan o no esas condiciones adicionales, que puede considerarse como un privilegio. No podemos aceptar, por tanto, que por la acción ilegal de una Junta se pueda privar a ningún ciudadano de ese derecho. En los recientes debates en el Congreso de los Estados Unidos en relación con la forma en que habrán de ejercitar el sufragio en las próximas elecciones los soldados que se encuentran en los distintos frentes de batalla, se ha demostrado el interés que la Nación y los Estados individualmente tienen en garantizar a dichos soldados para que puedan ejercitar ese derecho. Y esto es así, precisamente porque esta guerra se está librando para que podamos conservar y continuar disfrutando de la forma democrática de gobierno

en la cual imperan las leyes y no el mandato ilegal de una persona o de una Junta.

Somos de opinión que si la Junta Insular de Elecciones tiene el poder implícito que le reconoce la opinión contraria, no hay duda alguna de que también tiene dicho poder para cancelar, sin el debido procedimiento de ley, cualquiera o todas las demás peticiones de inscripción de las 277,000 objeto de las últimas inscripciones, y aun para ordenar la eliminación de las listas electorales de los nombres de aquellos electores que desde hace muchos años han figurado en ellas, cuando por cualquier motivo la Junta determine que están ilegalmente incluídos en las mismas. El próximo paso podría ser reconocerle poderes implícitos, cuando realice el escrutinio de las elecciones, para resolver si ha existido fraude o se han cometido errores fundamentales de ley, a pesar de que hemos resuelto en el caso de *Roca*, supra, que ésa es función judicial.

Aceptamos que debemos presumir que los deberes de un cargo han sido cumplidos con regularidad, pero esto no quiere decir que tenga que haber *fraude* de clase alguna para que la Junta Insular con el poder implícito que se le quiere reconocer pueda eliminar, sin previo aviso, a todas aquellas personas que a su juicio están incluídas indebidamente en las listas electorales. Esas personas podrían enterarse del hecho consumado, por la prensa, si es que pueden comprar o adquirir en otra forma el diario que publique la noticia. Si no sabe leer no se nos dice de qué medios se valdrá para enterarse.

La opinión contraria de hecho lo que hace es resolver el caso en sus méritos. Nosotros nos limitamos a decir que todos los 85,019 electores presuntivamente inscritos están sujetos a ser recusados en las distintas formas que aparecen de la ley y a las cuales nos hemos referido anteriormente. La determinación de si son tales electores o no, es una cuestión judicial y, a nuestro juicio, no es la Junta la llamada

a determinar si existe una cuestión judicial y luego proceder a resolverla.

De acuerdo con los términos de nuestra opinión, hemos demostrado las distintas formas en que podrá conseguirse, por los partidos afectados, que aquellos electores que no deban figurar en las listas electorales puedan ser eliminados antes de las elecciones y aun después de celebradas éstas que sus votos sean anulados. Frente a estos remedios adecuados se sostiene en la opinión contraria que los electores que ahora sean eliminados por la Junta Insular de Elecciones pueden "establecer el recurso que corresponda para lograr su inclusión, si es que tienen derecho a ello". ¿Qué remedio? La ley no lo provee. Además, la conclusión está predicada en el hecho de que constituye suficiente notificación al elector cuyo nombre ha sido eliminado el hecho de que puede enterarse por las listas que se exhiban al público o por las del comité local de su partido. Rechazamos la afirmación de que constituya una "frívola contención" sostener que esa clase de notificación no imponga al ciudadano "una obligación que él no viene obligado a cumplir". ¿Qué ley le impone ese deber? ¿Qué precepto de ley establece esta novel forma de notificar a un ciudadano a qüien se le priva de su derecho al voto sin haberlo oído siquiera? En cuanto a los avisos o notificaciones por medio de la prensa también es necesario para que sean válidos que un estatuto los autorice. La Ley Electoral nada dispone. Seguimos, por tanto, dentro del campo de los poderes y deberes "implícitos".

El triplicado de la petición de inscripción que se entrega al elector, de acuerdo con la sección 11 de la Ley, sin que en el mismo se haya hecho constar protesta alguna, constituye para él su certificado de que ha quedado debidamente inscrito. Es cierto que él ha podido investigar, antes de salir del colegio, que dicho triplicado estuviera completo, pero el hecho de que no lo hiciera puede depender de distintas cuestiones de hecho que a su vez envuelven cuestiones de derecho—y esto

demuestra el carácter judicial de su determinación—y no debemos resolver que la Junta Insular tiene *a priori* el poder implícito de cancelar toda petición que, a su juicio y *ex parte,* no reúna todas las condiciones que la ley exige.  Por ejemplo, pueden existir casos entre las 85,019 peticiones, en los cuales el triplicado entregado al elector esté completo y los miembros de la Junta de Inscripciones o alguno de ellos, por error o negligencia, no hayan firmado el original y el duplicado. ¿Puede sostenerse que no sean éstos casos típicos que envuelven una cuestión judicial a ser resuelta por las cortes?

Las secciones 7 y 10 de la Ley de Inscripciones no limitan en forma alguna los *motivos* por los cuales se puede *protestar* la *inscripción* de un elector.  Cualquier miembro de la Junta de Inscripciones pudo protestar una o todas las 85,019 papeletas por cualquiera de los defectos que contienen.  No se debe confundir los motivos de *recusación,* que sí están limitados por la sección 30 de la Ley Electoral, con los motivos de *protesta* que el legislador tuvo buen cuidado de no limitar en forma alguna.  Y esto es así, porque si la protesta fuera igual que una recusación, ¿para qué tenía el legislador que proveer *dos* etapas y *procedimientos* distintos para obtener el mismo resultado por los mismos motivos?   Debemos interpretar estas leyes por lo que ellas mismas dicen para que así pueda cumplirse con la intención legislativa al aprobarlas.

En cuanto al poder de la Junta Insular, de acuerdo con la sección 25, ésta dispone, primero, que se llevará un libro de electores con arreglo a las fechas de sus peticiones de inscripción y además un archivo de peticiones de inscripciones, con sus certificados de inscripción correspondientes, y que dicho archivo servirá de comprobación de los asientos del registro. En ninguna parte de la sección 25, o de alguna otra sección de la ley, se provee que la inscripción no se consuma hasta que la Junta Insular *pasa* sobre la petición y *ordena* su inclusión en el libro de electores.  Si la ley contuviera esas disposiciones, ¿por qué decir entonces que el poder de la Junta

Insular es implícito? De haberlas contenido seguramente que los peticionarios no hubieran iniciado esta acción.

La sección 11 es terminante y por sí sola decisiva de la cuestión planteada en este caso. Dice así:

"Sección 11.—A cada elector cuya *inscripción* fuere recibida por la junta de inscripciones se le entregará debidamente firmado por los miembros de la junta uno de los duplicados; otro quedará en poder de la junta local de elecciones y *el original se enviará al Superintendente General de Elecciones para preparar las listas de votantes.* Cuando una petición de inscripción fuere protestada, se entregará al elector uno de los duplicados *en la misma forma que en el caso de cualquier otra inscripción, pero se hará constar al dorso de la petición el hecho de haber sido protestada.* Si finalmente se resolviere que su *inscripción es legal, la corte que haya dictado la decisión final expedirá al elector, libre de honorarios, un certificado de tal hecho."* (Bastardillas nuestras.)

Establece el hecho de que es la Junta de Inscripciones quien, al dar por recibida la inscripción del elector, le entregará uno de los duplicados de la petición debidamente firmado por los miembros de la Junta, quien conservará otro y el original se enviará al Superintendente General de Elecciones para preparar las listas de votantes. La Junta Insular de Elecciones no interviene, no revisa, no ordena, no se le da intervención alguna. Es el Superintendente General a quien directamente se envían los originales de las peticiones para preparar las listas de electores nuevamente inscritos según se provee en la sección 27 de la Ley Electoral.([5]) Esta sección tampoco da intervención de clase alguna a la Junta Insular. ¿Cómo puede sostenerse, entonces, que ella tenga poder, no ya implícito sino concedido por la ley, para pasar sobre las peticiones de inscripción y ordenar o no su inclusión en el archivo y en las listas provisionales? Son las cortes, en los

---

([5]) La Sección 27 de la Ley Electoral en lo pertinente dispone:

"Sección 27.—El Superintendente General de Elecciones *hará preparar una lista* para cada precinto, por barrios y por orden alfabético, *de los electores nuevamente inscritos,* expresándose en ella los nombres, edad, color, sexo y dirección de dichos electores. De esa lista se harán copias, las cuales se enviarán por mensajero especial o por correo certificado no más tarde del treinta y uno

casos de peticiones protestadas, las que resuelven, de acuerdo con la sección 11, supra, si la inscripción es legal o no. Contrario a lo que se dice en la opinión que rebatimos, es una de las copias que prepara el Superintendente General la que se retiene en el archivo de la Junta Insular, es decir, la ley expresamente señala los deberes ministeriales que tiene que cumplir tanto el Superintendente General como la Junta Insular.

■ Sostenemos que la inscripción se consuma el día de las inscripciones si la petición no ha sido protestada. Es la ley la que expresamente así lo reconoce y determina a tenor de todos sus preceptos. Lo que no tenemos derecho a resolver, por interpretación, es que el legislador no quiso decir lo que sus palabras expresamente dicen y en esa forma establecer un poder implícito que la ley no concede a la Junta Insular. Sostenemos que la ley es clara y libre de toda ambigüedad y que, por tanto, no debemos menospreciar su letra bajo el pretexto de cumplir su espíritu. Artículo 13, Código Civil.

■ Lo que sí dice la Ley de Inscripciones, *expresamente*, en su sección 11, es que el original de la petición de inscripción se enviará al Superintendente General de Elecciones (no a la Junta) "para preparar la lista de votantes" a que se refiere la sección 27 de la Ley Electoral. El Superintendente General tiene el deber legal de preparar las listas provisionales tomando los datos de los originales de dichas peticiones, *sin intervención de clase alguna de la Junta Insular* y ese deber es claramente ministerial.

---

de marzo del año en que hubieren de celebrarse elecciones, al presidente de la junta local de elecciones del precinto electoral a que respectivamente correspondan y a los presidentes de las secciones y comités locales correspondientes de los partidos principales, y una copia se retendrá en *el archivo* de la Junta Insular de Elecciones. Inmediatamente que reciban dichas listas, los presidentes de las juntas locales de elecciones fijarán una copia al público en sitio visible, accesible y protegido de la entrada a las oficinas de sus juntas respectivas; y guardarán la copia restante en el archivo de la junta local de elecciones."

Ni hemos dicho ni sostenemos que las Juntas de Inscripción "tengan más poderes que la Junta Insular de Elecciones que las nombra." En primer término la Junta Insular no las nombra, y en segundo, rechazaríamos cualquier proposición que tendiera a sostener que las Juntas de Inscripciones tengan poder implícito o expreso para cancelar inscripciones.

█ Es fácil decir que los electores comprendidos en las 85,019 peticiones, cuando éstas sean canceladas por la Junta Insular, pueden ejercitar acciones independientes para obtener ser repuestos en las listas de electores. La ley no provee dicho remedio y, además, no debemos olvidar que se trata de un pueblo pobre y en gran parte analfabeto. Las inscripciones, de acuerdo con la ley (no nos cansamos de repetirlo), ya terminaron. Aquellos que tienen su certificado de inscripción, sin protesta alguna al dorso, tienen que presumir que el próximo paso que tienen que dar es votar el día de las elecciones. Nuestra opinión no resuelve que pueden votar sino que ellos pueden ser excluídos de las listas o recusados y sus votos anulados por las cortes. Esto puede obtenerse por los distintos partidos políticos afectados. Ellos pueden, si desean evitar el voto fraudulento, o eliminarlo o anularlo acudiendo a las cortes de justicia. La ley concede suficientes remedios para cerrar las puertas al fraude. Lo que no concede es remedio alguno al elector a quien la Junta ha cerrado la puerta, cancelando su inscripción sin el debido procedimiento de ley, para obtener que su nombre sea incluído de nuevo en las listas electorales.

El caso de *Scott* v. *Vaughn,* 168 N. W. 709, único citado para sostener la contención de los demandados, no es aplicable a los hechos del que resolvemos y a las leyes que interpretamos. Expresamente la Constitución de Michigan disponía que el Secretario de Estado al recibir la petición de enmienda él procedería a determinar "si había sido *firmada* por el número requerido de electores cualificados, y si ha sido firmada se someterá la enmienda a los electores en las próximas elec-

ciones . . . ''. Se le concedía, por tanto, un poder expreso para determinar si la petición estaba en forma legal o no. ¡Además, es obvio que si él rechaza la petición tiene que notificar a los interesados.

Desde el punto de vista de la opinión contraria, aceptamos que el presente no es un pleito de clase ya que la determinación de la validez de cada petición depende de distintos hechos. Empero, desde el punto de vista en que nosotros hemos enfocado el problema sí lo es, pues la cancelación en masa, sin vista, sin notificación, sin cumplirse con ningún requisito de ley por la Junta Insular afecta en la misma forma a 85,019 electores.

█ Reconocemos que un auto de mandamus no debe expedirse a menos que el deber a cumplir sea claramente ministerial. Sostenemos que aquí lo es. El Procurador General en representación del Superintendente General de Elecciones se ha allanado a la petición porque admite que su deber es ministerial y que la cancelación de una inscripción corresponde a las cortes y no a la Junta Insular. Si ese es su criterio—y sostenemos que es correcto—no necesita orden alguna, ni de la Junta ni de esta corte, para cumplirlo.

Estoy autorizado para decir que el Juez Asociado Sr. Snyder está conforme con esta opinión.