In re Héctor González Blanes, querellado.

Núm. 61.—*Sometido:* Julio 10, 1945. *Resuelto:* Noviembre 15, 1945.

*José A. Poventud, Jorge L. Córdova* y *José López Baralt,* abogados del querellado; *Luis Negrón Fernández, Fiscal Auxiliar del Tribunal Supremo,* abogado de El Pueblo.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

El Fiscal Auxiliar de este Tribunal presentó y sostuvo, por orden de esta Corte,(¹) una petición de *disbarment* contra el abogado Héctor González Blanes. La petición sustancialmente alega que en el caso número R-1931, que es una acción civil en la Corte de Distrito de San Juan seguida por Luisa Boix Domínguez et al. v. Junta Insular de Elecciones, el querellado, como abogado del Partido Unión Republicana Progresista, interventor en dicho pleito, el 9 de mayo de 1944 presentó una moción que literalmente dice:

"Moción interesando se anule la transferencia del Juez, Hon. Emilio S. Belaval para actuar como Juez de la Corte de Distrito de San Juan, e interesando su inhibición en estos procedimientos.

"Comparece el interventor, Partido Unión Republicana Progresista, y, ante esta Hon. Corte respetuosamente expone y solicita:

"1. Que al tiempo de la radicación de la causa arriba intitulada, o sea, en abril 24 de 1944, esta Hon. Corte estaba integrada por sus jueces en propiedad, Honorables: Marcelino Romaní, Ricardo La Costa, Jr., y R. Cordovés Arana; y, en sustitución del Hon. Jorge L. Córdova Díaz, actuaba el Juez *at Large,* Hon. Domingo Massari.

"2. Que los supuestos peticionarios, mediante la presente acción, pretenden hacer válidas innumerables solicitudes de inscripción, de las cuales, el Partido Popular Democrático alega que le corresponden a sus afiliados unas 50,000.

"3. Que una acción sustancialmente igual a la presente, mediante la cual se solicitó del Tribunal Supremo de Puerto Rico que incluyera a los aquí peticionarios en la lista de nuevos electo-

---

(¹) El Fiscal del Tribunal Supremo se inhibió de presentar la querella y se dictó entonces por esta Corte una orden dirigida al Fiscal Auxiliar para que procediese a presentarla y sostenerla.

res de Puerto Rico, fué declarada sin lugar por dicha Corte, pretendiéndose con el procedimiento ahora iniciado, evadir la sentencia emitida por la Corte Suprema de Puerto Rico.

"4. Que de conformidad con las reglas de esta Hon. Corte, correspondía al Juez, Hon. Domingo Massari, conocer del presente procedimiento y de otros seis casos idénticos, radicados con igual propósito, para hacer valer numerosas solicitudes de inscripción ilegales, que fueron rechazadas por la Junta Insular de Elecciones.

"5. Que el Gobernador de Puerto Rico está actuando como un líder conspicuo del Partido Popular Democrático, y, como tal, está muy interesado en favorecer ventajosamente a su partido en el resultado final de las elecciones y en que tenga éxito el presente procedimiento, confeccionado, propulsado y seguido por representantes destacados del referido Partido Popular, para dar lugar a que personas que no reúnen los requisitos de ley voten en las próximas elecciones, dando, de esa suerte, oportunidad a la realización de un fraude electoral.

"6. Que desde el fallo adverso emitido por el Hon. Tribunal Supremo, el Gobernador de Puerto Rico ha realizado actos ilegales para desvirtuar, en beneficio de su partido y en contra de los actores políticos que han venido combatiendo sus ejecutorias como Gobernador, las actuaciones legales de la Junta Insular de Elecciones y los efectos del fallo de nuestro más alto tribunal; y, al efecto, aprovechando la circunstancia de haberse creado dos vacantes en la Junta Insular de Elecciones, cubrió dichas vacantes nombrando a Gustavo Cruzado Silva y a Ernesto Mieres Calimano para actuar en representación del Partido Liberal, que es uno de los cuatro principales partidos políticos de Puerto Rico, atendiendo solamente a una carta del entonces Presidente de dicha colectividad, José Ramírez Santibáñez, y haciendo caso omiso, en flagrante violación de la ley, de la recomendación que le hiciera la Junta Central del Partido Liberal.

"7. Que llevado el asunto ante la Corte Suprema de Puerto Rico por Luis Archilla Laugier y José Enrique Gelpí, que eran las personas recomendadas por la Junta Central del Partido Liberal y con verdadero derecho a cubrir dichas vacantes, el Tribunal Supremo anuló la actuación ilegal del gobernador y ordenó nombrar a dichos señores como miembros de la Junta Insular de Elecciones.

"8. Que era público y notorio que los verdaderos y auténticos representantes del Partido Liberal en la Junta Insular de Elecciones, como miembros de dicha Junta, se oponían, como oficialmente se opusieron y continúan oponiéndose formalmente, a la aceptación

como válidas de las peticiones de inscripción en controversia, por entender que éstas son de todo punto enteramente nulas e ilegales.

"9. Que desde entonces, el gobernador de Puerto Rico, cooperando con los líderes del Partido Popular Democrático, ha utilizado y continúa utilizando su jerarquía de gobernador de Puerto Rico para desvirtuar los efectos de la actuación de la Junta Insular de Elecciones y del fallo emitido por la Corte Suprema de Puerto Rico en el caso de Benjamín Cruz et al. v. Junta Insular de Elecciones, y a ese efecto ha utilizado su posición de gobernador para realizar los cambios extraordinarios y transferencias que a continuación se expresan:

"10. Que el Juez de la Corte de Distrito de Bayamón, señor Emilio S. Belaval, está afiliado al Partido Popular Democrático, y el gobernador de Puerto Rico, al radicarse el presente procedimiento ante la Corte de Distrito de San Juan, sin necesidad alguna para ello, hizo transferir a dicho Juez de la Corte de Distrito de Bayamón para que actuara como Juez Interino de la Corte de Distrito de San Juan, y a la vez hizo transferir al Juez, Hon. Domingo Massari, para que actuara en la Corte de Distrito de Guayama.

"11. Que el Gobernador de Puerto Rico, interesado personalmente en el éxito de la petición en el presente caso, ha hecho, después de radicada esta acción, al señor Juez Belaval, secretamente, ofertas de ascenso en la judicatura, cuyas promesas fueron aceptadas, existiendo actualmente el convenio formal de que de vacar la plaza del señor Jorge Luis Córdova en la Corte de Distrito de San Juan, el Juez señor Belaval será nombrado por el gobernador para ocupar dicho cargo.

"12. Que la petición de *Mandamus* en estos autos se presentó ante el Juez, señor Massari, y, dicho Juez, en 14 de abril de 1944, asumió jurisdicción en el caso y expidió el auto alternativo, señalando la vista para tener efecto el día 2 de mayo de 1944.

"13. Que antes del 2 de mayo de 1944, se trasladó al señor Massari a la Corte de Distrito de Guayama.

"14. Que la forzada maniobra para traer al señor Belaval a San Juan, la injustificada remoción y traslado del señor Massari a una corte de la isla, luego de haber dicho juez asumido jurisdicción y de haber comenzado a actuar en el presente caso, tanto así como el nombramiento del señor Calderón para sustituir al señor Belaval en la Corte de Distrito de Bayamón y el traslado del Juez de Bayamón, señor Belaval, todo ello con el fin único de acomodar a dicho Juez, señor Belaval, en la plaza ocupada por el señor Massari en esta Corte, en manera alguna responde ni a la ley ni a la práctica

administrativa por largos años seguida en Puerto Rico, siendo ésta la única vez en que un gobernador de esta isla pone en efecto, con tan evidente y ofensivo propósito, un procedimiento inusitado, dirigido a escoger un juez para que entienda en y falle determinado litigio.

"15. Que el nombramiento del señor Enrique Campos del Toro, para Procurador General de Puerto Rico, ha sido fuertemente respaldado por el gobernador, y dicho Enrique Campos del Toro, aún cuando su nombramiento no ha sido confirmado, de hecho, ha intervenido y actuado en los asuntos del Departamento de Justicia, coadyuvando en la realización de aquellos cambios que sirvan a los deseos y propósitos del Gobernador de Puerto Rico, habiendo sido por indicación de dicho Enrique Campos del Toro que el Departamento de Justicia intervino y llevó a efecto los nombramientos y cambios interesados por el gobernador de Puerto Rico para traer a San Juan al señor Belaval en sustitución del Juez at Large, señor Domingo Massari.

"16. Que recientemente y para dar visos de legalidad al nombramiento del señor Belaval, el gobernador de Puerto Rico le ha extendido otro nombramiento, para que continúe en la Corte de Distrito de San Juan por un período adicional, en sustitución, según ahora se alega, del señor Jorge Luis Córdova Díaz, a quien corresponde en propiedad el indicado cargo.

"17. Que dentro de las libertades que le están permitidas a El Pueblo de Puerto Rico bajo el actual gobierno que disfruta, está la de tener representación en la Asamblea Legislativa, y la anulación de tal prerrogativa por parte del Gobernador de Puerto Rico, mediante actuaciones de su parte, que tienden a violentar nuestra ley electoral y a intervenir en la administración de la justicia, con miras a favorecer un movimiento conducente a facilitar el fraude electoral, envuelve una cuestión de suma gravedad y de enorme interés público.

"18. Alega el interventor que la transferencia aludida es ilegal y contraria a la ley por los siguientes fundamentos: .

"(a) Porque ninguno de los jueces de la Corte de Distrito de San Juan ha solicitado que el Juez, señor Belaval, celebre la sesión durante la cual han de ventilarse estos procedimientos.

"(b) Porque cuando el Juez, señor Belaval, fué transferido para ocupar en la Corte de Distrito de San Juan el lugar del señor Massari, la labor de la Corte de Distrito de Bayamón, exigía su presencia en aquel tribunal, tanto así que, en sustitución suya se nombró interinamente al señor José M. Calderón, quien actualmente actúa

como Juez en dicha Corte, y al Juez Massari se le envió a la Corte de Distrito de Guayama, para que sustituyese al Juez de aquel distrito, señor Barceló, quien no está enfermo ni se ha ausentado de la isla, ni existe causa fundada para que él se retire de su cargo y permanezca retirado hasta tanto se tramiten en San Juan y en los distintos distritos de la Isla los varios procedimientos de mandamus que se han radicado a instancias de líderes conspicuos del Partido Popular.

"(c) Que de haber estado impedidos de actuar en estos procedimientos por razón de sus ocupaciones, los tres jueces en propiedad que actualmente permanecen y están actuando en la Corte de Distrito de San Juan, entonces la transferencia del señor Massari, a raíz de la radicación de estos procedimientos de mandamus, es claramente improcedente, por lo que son injustificadas y arbitrarias las actuaciones del gobernador, resultando evidente que dicha transferencia se efectuó en contra y no en favor del interés público.

"(d) Que la transferencia del señor Belaval de la Corte de Distrito de Bayamón a la del Distrito de San Juan, y el envío del Juez, señor Massari, a la Corte de Distrito de Guayama, así como el nombramiento del Juez Calderón para sustituir al Juez Belaval en la Corte de Distrito de Bayamón, se debió únicamente al interés del gobernador, actuando como líder conspicuo del Partido Popular Democrático de Puerto Rico, de lograr un propósito personal y político suyo, cual es la intervención en estos procedimientos de un juez perteneciente al Partido Popular, cuya transferencia a este distrito se ha verificado después de una serie de traslados inusitados y extraordinarios con el fin primordial y único de que dicho juez de distrito, señor Belaval, sea quien resuelva las cuestiones importantes envueltas en estos casos.

"19. Que existiendo las circunstancias arriba expuestas y entrañando el presente caso la consideración de cuestiones de gran interés público, la justicia quedaría cabalmente servida si en lugar del señor Belaval, o de cualquier otro juez traído por el gobernador de Puerto Rico para que intervenga en estos procedimientos, el presente caso se sometiera y se tramitara ante los tres actuales jueces en propiedad de esta Hon. Corte, Honorables Marcelino Romany, R. La Costa Jr., y R. Cordovés.

"20. Que la continuación de estos procedimientos ante el juez señor Belaval, habida cuenta de la maniobra mediante la cual se ha logrado por el gobernador hacerle intervenir como juez en estos procedimientos, así como la aceptación por el señor Belaval de la realización de dicha maniobra en adición a los demás hechos rela-

tados, constituye fundado motivo para creer que los procedimientos en el presente caso no estarán revestidos de la imparcialidad a que tienen derecho los demandados y el interventor.

"POR TODO LO CUAL, respetuosamente solicita el interventor de esta Hon. Corte que se abstenga e inhiba el Juez, Hon. Emilio S. Belaval, de tomar conocimiento de esta causa, por no haberse hecho su transferencia a la Corte de Distrito de San Juan de conformidad con la ley y porque, atendido el interés del Gobernador en estos procedimientos y los cambios injustificados hechos en las cortes de distrito de la isla para que el caso se someta al señor Belaval, como Juez, existe motivo para creer que no habrá de celebrarse un juicio imparcial.

"Asimismo solicita el interventor que luego de inhibirse el señor Belaval de conocer de estos procedimientos y, en garantía de la más imparcial justicia, se constituya esta corte en tribunal colegiado compuesto de sus tres jueces en propiedad, señores Marcelino Romany, R. La Costa, Jr. y R. Cordovés Arana, y así constituído procedan a conocer de la presente acción, que es una que envuelve gran interés público, y dicte aquellas providencias, resoluciones y sentencias que en derecho y en verdadera justicia procedan.

"San Juan, Puerto Rico a 9 de mayo de 1944.—(Fdo.) Héctor González Blanes.—Abogado del Interventor."

Se alega, además, en la petición de disbarment, que las imputaciones contenidas en la transcrita moción al efecto de que el Gobernador había prometido al Juez Belaval nombrarlo juez en propiedad de la Corte de Distrito de San Juan, en el entendido de que resolvería dicho caso a favor de los peticionarios, y que esa promesa fué aceptada por el Juez, son falsas y fueron hechas por el querellado sin que le constase su certeza y sin tener causa probable o fundamento alguno para creer en la verdad de ellas; que dichas manifestaciones constituyen materia escandalosas y fueron vertidas con la maliciosa intención de exponer al Tribunal y al Juez Sr. Belaval, así como al Gobernador de Puerto Rico, al odio y desprecio de la comunidad y de menoscabar su honradez, integridad y buena fama, mediante la imputación de un delito público, todo ello en violación de los deberes que el querellado, como abogado, tenía para con dicha Corte y Juez.

En su contestación admitió el querellado haber presentado la transcrita moción; y afirma que todo cuanto dijo en la misma es cierto, y que cuando la presentó, lo mismo que al tiempo de contestar la petición, tenía fundamento o causa probable para creer que tales manifestaciones son ciertas; negó que la referida moción contuviese materia escandalosa, y que al presentarla lo hiciera con intención maliciosa, alegando que su única intención fué la de cumplir con el deber, que como abogado, tenía para su cliente.

Por vía de defensa alegó: (a) que esta Corte carece de jurisdicción para conocer de este procedimiento de disbarment; (b) que la petición no aduce hechos constitutivos de causa de acción y (c) que, de prevalecer la petición interpuesta, quedarían menoscabados los derechos, inmunidades y libre ejercicio de la profesión del querellado, así como la necesaria libertad que debe gozar en el desempeño consciente de su profesión ante los tribunales, en el sentido de no coartarle, restringirle ni privarle del deber de instar a nombre de su cliente la inhibición de un juez con exposición franca de fundamentos que prima facie y razonablemente demuestren que su representado no habría de obtener justicia imparcial; en contravención todo ello con la disposición sobre el debido procedimiento contenido en la Enmienda V a la Constitución Federal y en el artículo 2, párrafo 1 de la Ley Orgánica de Puerto Rico, aprobada en marzo 2 de 1917.

Estipularon el Fiscal y el querellado someter el caso por la evidencia recibida en la investigación practicada por los Fiscales Gómez, Aponte y Rodríguez Serra, debiendo unirse a dicha evidencia 16 documentos marcados Exhibits 1 al 16 inclusive, que inadvertidamente no fueron presentados por el querellado al Fiscal Gómez. Se estipuló, además, renunciar al derecho de informar oralmente y en someter la cuestión por alegatos, los cuales fueron presentados.

I

La alegada falta de jurisdicción está predicada en que la petición ha sido presentada por el Fiscal Auxiliar, sin que al así actuar dicho funcionario lo haga por delegación del Procurador General. El querellado invoca la sección 13 de la Ley núm. 9 de 11 de marzo de 1909(²) y el artículo 2, inciso *g*, de la Ley para Determinar la Organización del Colegio de Abogados de Puerto Rico (Ley núm. 43 de 14 de mayo de 1932).(³)

Como hemos indicado anteriormente, el Fiscal Auxiliar presentó la petición por orden de este Tribunal, el cual tiene facultad inherente para determinar quiénes pueden ejercer como abogados en las cortes insulares, facultad que conlleva la de eliminar del Registro de Abogados aquéllos que por sus actuaciones se hagan indignos de ejercer la profesión. *In re Bosch,* 65 D.P.R. 248, (1945); *In re Arroyo Rivera,* 63 D.P.R. 796, 798, (1944); *In re Tormes,* 30 D.P.R. 267, (1922); *In re Claiborne,* 119 F.2d 647 (C.C.A. 1st., 1941); *In re De Caro,* 262 N.W. 132, (Iowa 1935); *In re Ulmer,* 167 N.E. 749 (Mass. 1929); *In re Gibbs,* 214 N.W. 850,

_____

(²) La sección 13 de la Ley núm. 9 de 11 de marzo de 1909, pág. 105, dice así:

"Será el deber del Attorney General de Puerto Rico, o de cualquier Fiscal que él designe, sostener la acusación en todos los casos para la remoción o suspensión de abogados según queda expresado."

(³) El artículo 2, inciso *g*, de la Ley para Determinar la Organización del Colegio de Abogados de Puerto Rico, dice así:

"El Colegio de Abogados de Puerto Rico tendrá facultad:

"* * * * * * *

"(*g*) Para recibir e investigar las quejas que se formulen respecto a la conducta de los miembros en ejercicio de la profesión, pudiendo remitirlas a la Junta de Directores para que actúen, y después de una vista preliminar, en la que se dará oportunidad al interesado, si encontrara causa fundada instituir el correspondiente procedimiento de destitución (disbarment), ante la Corte Suprema de Puerto Rico. Nada de lo dispuesto en este apartado se entenderá en el sentido de limitar o alterar la facultad del Procurador General de Puerto Rico para iniciar por su propia cuenta estos procedimientos."

(S. D. 1927); *In re Keenan,* 192 N. E. 65, 96 A. L. R. 79, (Mass. 1934).

Es verdad que los tribunales han sostenido la validez de la legislación aprobada en auxilio de ese poder inherente; pero cuando esa legislación ha tenido el efecto de privar o menoscabar el derecho inherente de las cortes, éstas han anulado tal legislación, *In re Edwards,* 266 P. 665 (Idaho 1928); *Norfolk & Portsmouth Bar Ass'n* v. *Drewry,* 172 S. E. 282 (Va. 1934), pero las leyes invocadas por el querellado no menoscaban ese poder que tiene esta Corte. La primera de ellas impone al Procurador General o al Fiscal que él designe, el deber de sostener la acusación y le faculta para iniciar o investigar la conducta profesional de los abogados. La segunda autoriza al Colegio de Abogados para investigar quejas que se formulen respecto a la conducta profesional de sus miembros y para instituir el correspondiente procedimiento de disbarment ante el Tribunal Supremo, si se encontrare causa probable para instituirlo. Esas leyes no afectan el poder que tiene esta Corte para que, sin esperar que se radique queja alguna, ordenar de su propia iniciativa que se investigue cualquier asunto relacionado con la conducta de sus oficiales, como lo son los abogados, cuando el Tribunal tenga información de conducta impropia por parte de ellos, que a su juicio demande su intervención. *Matter of Bar Association of City of New York,* 222 App. Div. 580 (N. Y. 1928); *In re Tormes,* supra; *Randall* v. *Brigham,* 7 Wall. 523, 19 L. ed. 285, (U. S. 1868). Y como el poder inherente del Tribunal Supremo no se deriva del poder legislativo, la causa de disbarment no tiene que ser necesariamente una de las definidas en los estatutos, siempre que al abogado se le conceda una oportunidad de ser oído en su defensa. *In re Tormes,* supra; *In re Myrland,* 45 P.2d 953 (Ariz 1935); *Wood* v. *State,* 165 S. E 908 (Ga. 1932); *In re Richards,* 63 S. W.2d 672, (Mo. 1933).

Es claro que si esa facultad puede ejercerla el Tribunal *sua sponte,* puede delegar en cualquier abogado. *In re Claiborne,* supra, y con mayor razón en el Fiscal Auxiliar de esta Corte, para que presente la querella y sostenga la acusación, especialmente cuando, como en este caso, el Fiscal de este Tribunal se inhibió de actuar.

## II

██ A los efectos de determinar si la petición aduce hechos, debemos aceptar como ciertas sus alegaciones. Brevemente las hemos expuesto y hemos transcrito la moción de inhibición.

El juramento que al ser admitido al ejercicio de la abogacía prestó el querellado le obliga a guardar el respeto debido a las cortes de justicia y a los funcionarios judiciales, y el primero de los Cánones de Etica Profesional, tratando de los Deberes del Abogado Para Con Los Tribunales, entre otras cosas, prescribe:

"Es deber del abogado observar hacia al Tribunal una actitud respetuosa, no a beneficio del que entonces desempeñare el cargo de Juez, sino para dar prestigio al cargo mismo y sostener su capital importancia."

Los casos de *Pueblo* v. *Gelpí,* 59 D.P.R. 36 y *Peña* v. *García,* 45 D.P.R. 44, no son de aplicación. En el primero los abogados Gelpí fueron procesados por desacato por el solo hecho de haber radicado una moción de traslado en la que, al exponer los fundamentos de la misma, hacían imputaciones graves contra el Juez. Sin darse a los querellados una oportunidad de probar los hechos alegados en su moción, el Juez los condenó por desacato y este Tribunal, al revocar la sentencia, dijo al final de su opinión:

"A los querellados debió concedérseles la oportunidad de probar los hechos alegados en su moción y de resultar éstos falsos y maliciosos entonces haberse procedido en su contra de acuerdo con la

ley. De ser ciertas las alegaciones contenidas en la moción los demandantes en el pleito tenían derecho a solicitar y obtener la inhibición del Juez o traslado del caso." (Pág. 45.)

En el caso que nos ocupa se alega en la petición de disbarment que los hechos alegados en la moción de inhibición fueron expuestos por el querellado sin que le constase su certeza y sin tener fundamento o causa probable para creer que eran ciertos.

El caso de *Peña* v. *García,* supra, no es de aplicación porque en el presente caso no estamos pasando sobre los méritos de la moción de inhibición. La cuestión aquí en controversia es si el querellado, como se alega en la petición, expuso los hechos de su moción sin constarle su certeza y sin tener fundamento o causa probable para creer que eran ciertos. Si los hechos alegados eran ciertos, pero aún no siéndolos, si el querellado tuvo fundamento o causa probable para creer que lo eran y la moción no fué presentada maliciosamente sino con el propósito de obtener el juicio imparcial a que todo litigante tiene derecho, entonces el querellado tendría que ser absuelto del disbarment. Pero ésa es una cuestión de hecho que depende del resultado de la prueba. Por lo tanto somos de opinión que la petición es suficiente.

### III

La tercera defensa no amerita una extensa discusión. La libertad de que goza el abogado para defender a su cliente y el derecho que la ley le concede a solicitar la inhibición del juez cuando tiene motivo razonable para creer que no ha de tener un juicio imparcial, no llega al extremo de permitirle basar su moción de traslado o inhibición en imputaciones graves contra el juez, sin constarle la certeza de tales imputaciones o sin tener fundamento o causa probable para creer que los hechos imputados son ciertos. Al igual que sucede con la defensa II, su éxito depende del resultado de la prueba.

## IV

Resueltas las cuestiones de derecho, pasemos ahora a considerar el caso en sus méritos.

En las inscripciones celebradas en Puerto Rico los días 15 y 16 de enero, 1944, se presentaron un total de 277,471 peticiones de inscripción en todas las Juntas de Inscripción de la Isla. De ese total, 85,019 adolecían de ciertos alegados defectos, por los cuales la Junta Insular de Elecciones acordó, por mayoría, declararlas nulas. Contra esa resolución, el Partido Popular Democrático, Luis Muñoz Marín, Samuel R. Quiñones y David Benjamín Cruz, recurrieron ante este Tribunal en solicitud de un auto de mandamus. Alegaron, entre otras cosas, que las 85,019 peticiones, 55,000 correspondían a personas afiliadas al Partido Popular Democrático, las cuales quedarían privadas de votar si prevalecía la resolución de la Junta. Solicitaron que fuese sostenida la validez de las 85,019 peticiones y en su consecuencia se ordenase a la Junta y al Superintendente General de Elecciones que le diesen el curso que de conformidad con la ley, correspondía a peticiones válidas.

Para aquella fecha existía en esta Corte la misma vacante que aún prevalece y estando igualmente dividida la opinión de los cuatro jueces, el 28 de marzo de 1944 se dictó sentencia denegando la petición de mandamus. *Partido Popular v. Junta Insular de Elecciones*, 63 D.P.R. 296.

Volviendo ahora a la resolución de la Junta Insular de Elecciones debemos notar que el voto del representante del Partido Liberal Puertorriqueño fué el que determinó que dicha resolución fuese dictada, pues votaron en contra de la validez de las peticiones los representantes del Partido Unión Republicana Progresista, Partido Socialista y Partido Liberal Puertorriqueño; a favor el del Partido Popular Democrático y se abstuvo de votar el Superintendente General de Elecciones. Pero poco tiempo después de tomado el

acuerdo y antes del 12 de marzo de 1944, el Sr. Dubón renunció su cargo como representante del Partido Liberal en la Junta Insular de Elecciones. Claro es que en caso de que el sucesor del Sr. Dubón no compartiese la opinión de éste respecto a la validez de las peticiones, en una reunión de la Junta podía intentarse reconsiderar la resolución y dictarse otra pretendiendo convalidar las 85,019 peticiones,[4] no obstante la sentencia de esta Corte negándose a expedir el auto de mandamus.

Mientras se estaba pendiente de que el Gobernador nombrase el representante del Partido Liberal, el senador Iriarte, según declaró ante el Fiscal Gómez, manifestó en presencia del senador Muñoz Marín, Jefe del Partido Popular y Presidente del Senado, que éste era el responsable de que esos electores perdiesen su voto, ya que él (Iriarte) y el Dr. Figueroa, le habían invitado a presentar enmiendas a la Ley Electoral, a fin de convalidar las peticiones de inscripción de aquéllos que tuvieren derecho a votar, y que el Sr. Muñoz Marín nada había hecho en ese sentido. Agrega el Sr. Iriarte en su declaración que el senador Muñoz Marín, en presencia de los señores Teófilo Maldonado, Samuel R. Quiñones y Susoni le contestó que él (Muñoz Marín) arreglaría el asunto administrativamente.[5] Declaró, además, el sena-

---

[4] Votando el nuevo representante del Partido Liberal a favor de la validez de las peticiones, el voto de los cuatro representantes de los partidos estaría igualmente dividido. En el supuesto de que el Superintendente General se abstuviese de votar, el voto del Gobernador decidiría el empate. Art. 36 de la Ley Electoral.

[5] En una declaración jurada ante el Fiscal Auxiliar de la Corte Suprema, el 8 de marzo de 1945, refiriéndose a las manifestaciones que le imputó el senador Iriarte, el senador Muñoz Marín dice: ''Recuerdo muy imperfectamente la conversación a que alude el senador Iriarte. Es posible que estuviéramos hablando sobre el Plan de Trabajo de Emergencia y no sobre la situación de los 85,000 electores. En cuanto al Plan de Emergencia el Gobierno hizo esfuerzos por mantenerlo funcionando en beneficio de los desempleados por medios administrativos. Pero no estoy enteramente seguro de esto, puede ser que estuviéramos hablando sobre los 85,000 electores. De lo que estoy

dor Iriarte que el día siguiente a esta conversación, o sea el 30 de marzo de 1944, el Gobernador nombró al Sr. G. Cruzado Silva, quien no participaba de la opinión del Sr. Dubón, representante del Partido Liberal en la Junta Insular de Elecciones, y al Sr. Ernesto Mieres Calimano, representante suplente.([6]) Estos señores habían sido recomendados al Gobernador por el entonces Presidente del Partido Liberal, Sr. José Ramírez Santibáñez, en abierta violación a lo acordado por la Junta Central de dicho Partido, la cual era el único organismo con facultad legal para hacer tal recomendación. La Junta había recomendado a los señores Luis Archilla y José E. Gelpí, el primero de los cuales había hecho pública su conformidad con la opinión del Sr. Dubón.([7]) Recurrieron ante esta Corte los señores Archilla y Gelpí solicitando un auto de mandamus para compeler al Gobernador a nombrarlos, y por los méritos del caso se declaró con lugar la petición y se dictó el auto perentorio ordenando al Gobernador que procediese a nombrarlos y así lo hizo. *Archilla v. Tugwell, Gobernador,* 63 D.P.R. 413.

Pocos días después, alrededor del 10 de abril de 1944,([8]) varios pleitos, sustancialmente idénticos al del *Partido Po-*

---

absolutamente seguro es de que en forma alguna mi intención al hablar de remedios administrativos, puede haber tenido relación alguna con traslados de jueces. No pensé, desde luego, en traslado de jueces. No es mi norma actuar en tal forma. . . . . .".

([6])Parece pertinente decir aquí que el Sr. Rodríguez Pacheco declaró al efecto que el día 30 de marzo, por la noche, sostuvo una conversación por teléfono con el Gobernador Tugwell en la cual le pidió que nombrase a los señores Archilla y Gelpí que habían sido recomendados por la Junta Central, y que el Gobernador le informó que ya había extendido los nombramientos a favor de otras personas (no recordaba el Gobernador los nombres) y a la vez dijo a Rodríguez Pacheco: "¿Usted también está en contra de Don Pepe?", refiriéndose al Sr. José Ramírez Santibáñez, Presidente entonces del Partido Liberal.

([7])Edición del periódico El Mundo correspondiente al 15 de marzo de 1944.

([8]) Conforme declaró el Secretario de la Corte de Distrito, Sr. Andréu Ribas, la petición de mandamus juntamente con el proyecto de auto alternativo estaban en la oficina del Juez Massari desde el día 10 de abril, siendo radicada la petición el día 12.

*pular* v. *Junta,* supra, fueron presentados en todas las cortes de distrito de la Isla a nombre de las personas residentes en los respectivos distritos cuyas peticiones de inscripción habían sido anuladas por la resolución de la Junta. El que se presentó en la Corte de Distrito de San Juan fué instituído a nombre de Luisa Boix Domínguez, et al. La sección tercera de la Corte de Distrito de San Juan era donde debía verse el caso y para aquella fecha la presidía el Juez de Distrito At Large, Sr. Massari, quien actuaba en sustitución del Juez en propiedad Sr. Córdova, mientras durase la licencia que se le había concedido. Uno de los abogados de la demandante presentó al Juez Massari la petición de mandamus y un proyecto de auto alternativo, pero el Juez rehusó firmar inmediatamente el auto alternativo y expresó la necesidad de estudiar detenidamente el asunto antes de dictar resolución alguna. Luego de considerar el caso y de haber expresado ciertas dudas con respecto a si debía o no denegarse de plano la petición, por entender que se trataba de un caso ya resuelto por el Tribunal Supremo, optó por expedir una orden citando a las partes para que informasen sobre la procedencia del remedio solicitado. Firmó esa orden, pero no le dió curso porque el Secretario Andréu Ribas, quien conocía la actitud mental del Juez, inmediatamente se puso en comunicación con el Sr. Samuel R. Quiñones, otro de los abogados de los peticionarios, quien a través del Secreario envió un mensaje al Juez para que no dictase resolución alguna en el caso hasta que dicho abogado pudiese discutir con él la cuestión. Al efecto, al día siguiente, tuvieron una entrevista en la cual dicho abogado, lo convenció de que podía firmar el auto alternativo y dejarlo sin efecto si luego se convencía de su improcedencia. En las últimas horas de la mañana del 14 de abril el Juez firmó el auto alternativo y señaló la vista del caso para el 2 de mayo siguiente. Horas después se comunicó al Juez Massari la orden del Departamento de Justicia trasladándolo a la Corte

de Distrito de Guayama en sustitución del Juez Barceló, a quien se había concedido licencia. Para sustituir al Juez Massari en la Corte de Distrito de San Júan, fué traído el Juez de la Corte de Distrito de Bayamón, Sr. Belaval,[9] quien en aquella fecha, según su testimonio, tenía varios casos pendientes de resolución, algunos de ellos de gran importancia y urgencia. Para sustituir al Juez Belaval en la Corte de Distrito de Bayamón fué nombrado interinamente el abogado José M. Calderón.

En aquellos días el Juez Massari se hallaba convaleciendo de una larga enfermedad, por lo que insistió con el Procurador General Interino y con el Sr. Campos del Toro—[10] cuyo nombramiento de Procurador General de Puerto Rico se hallaba pendiente de confirmación por el Senado de los

---

[9] El nombramiento del Juez Belaval fué extendido por el Gobernador Tugwell el sábado 15 de abril de 1944.

[10] Desde su oficina de Coordinador en la Fortaleza el Sr. Campos del Toro tenía una gran ingerencia en la dirección del Departamento de Justicia. Exhibit EX págs. 125 y 142 y carta del Sr. Borinquen Marrero, de 6 de septiembre de 1944, dirigida al Juez Belaval, Exhibit 12 JCA, que dice:

"6 de septiembre de 1944, Hon. Emilio S. Belaval, Juez de Distrito, Calle Estado 14, (Miramar), Santurce, P. R.—Mi apreciado amigo y compañero: —De conformidad con la conversación telefónica sostenida por nosotros en el día de hoy, me complazco en ratificarte que recuerdo perfectamente bien que el Lic. Enrique Campos del Toro me llamó por teléfono en la tarde del día 18 de abril de 1944 a mi oficina en la División Legal del Departamento de Hacienda. Accediendo a sus deseos me trasladé a la oficina del Lic. Campos del Toro en la Fortaleza y allí él me preguntó si estaba dispuesto a venir a Guayama para actuar como Juez Interino de la Corte de Distrito, mientras duraran las vacaciones del Juez Barceló, empezando el lunes 24 del referido mes de abril. Me preguntó además el Lic. Campos del Toro si en caso de vacar el cargo de Juez de Distrito de Guayama, por renuncia del Juez Barceló, quien sería nombrado Procurador General Interino, estaría yo dispuesto a aceptar que se me designara en propiedad. Contesté ambas preguntas afirmativamente y al extendérseme el correspondiente nombramiento por el Gobernador de Puerto Rico actué como Juez de Distrito Interino de Guayama desde el 24 de abril hasta el 27 de junio, inclusive.

"Más tarde, según es de conocimiento público, al nombrarse al Lic. Barceló Presidente de la Comisión de Servicio Público, se me designó a mí Juez de Distrito de Guayama.—Sinceramente, (Fdo.) B. Marrero Ríos.—B. Marrero Ríos."

Estados Unidos—para que no lo enviasen a Guayama, pero todos sus esfuerzos fueron inútiles. Se le dijo que iría a Guayama por pocos días. Así fué en efecto. El primer día hábil para tomar posesión de la Corte de Distrito de Guayama fué el martes 18 de abril y ese día salió para su destino en compañía del Juez Barceló. Pero ese mismo día sin embargo, el Procurador General Interino recomendó al Gobernador el nombramiento del Sr. Borinquen Marrero para Juez Interino de la Corte de Distrito de Guayama, extendiendo el nombramiento el Gobernador dos días después, jurando su cargo el Juez Marrero el día 21 de abril. Regresó a San Juan el Juez Massari el 22 de abril, y permaneció en la oficina del Procurador General hasta el 7 de mayo de 1944 en que fué enviado a Ponce. Salta a la vista que si el Juez Marrero iba a ser recomendado el 18 de abril, es decir, el mismo día en que salía para Guayama el Juez Massari, ¿qué fin laudable pudo haber inspirado su traslado de la Corte de Distrito de San Juan casi inmediatamente después de haber firmado el auto alternativo de mandamus, luego de haber expresado sus fuertes dudas sobre su procedencia?(11)

---

(11)Sobre la necesidad de estos cambios de jueces tomamos de la declaración del Procurador General Interino Sr. Rodríguez Ramos, quien dispuso el traslado del Juez Massari:

"P.—De manera, Sr. Rodríguez Ramos, que si le preguntáramos a usted o yo le hiciera la pregunta directa de qué necesidad había de trasladar al Juez Massari a la Corte de Distrito de Guayama, ¿qué contestaría usted? R.—Que no había necesidad ninguna.

\*      \*      \*      \*      \*      \*      \*

"P.—Prácticamente no hubo ninguna necesidad ni fundamento alguno para trasladar al Juez Massari a Guayama y traer al Juez Belaval a San Juan. R.—Necesidad imperiosa no la había. P.—¿El servicio no lo requería? R.—Indiscutiblemente, no." Exhibit EX, págs. 72, 73-4.

Y de la declaración del Sr. Campos del Toro tomamos lo siguiente:

"P.—Muy bien con respecto al señor Barceló de la Corte de Distrito de Guayama. ¿Por qué consideró usted necesario que para sustituir al Juez Belaval, digo Barceló en Guayama tuviera que ser trasladado el Juez Massari que actuaba en San Juan en sustitución del Juez Córdova Díaz? R.—La razón que hubo para eso es fácil, es la siguiente: El Ledo. Calderón, candidato del señor Barceló para el cargo de Juez interino de Bayamón, nunca había ocupado un cargo en la judicatura, nunca había tenido

Pero eso no es todo. Parece natural y lógico que si lo que en realidad motivó el traslado del Juez Massari fué simplemente sustituir al Juez Barceló, una vez nombrado el Juez Marrero para Guayama y volver el Juez Massari a San Juan se hiciese cargo éste de nuevo de la Corte de Distrito de San Juan como Juez at large en sustitución del Juez Cór-

la experiencia de ser juez de distrito y además de eso reside aquí en Santurce. Se consideró que dentro de esas circunstancias no era aconsejable nombrar al Ledo. Calderón para ocupar el cargo de Juez interino de San Juan en sustitución del Juez Córdoza Díaz, por su falta de experiencia y que no debía ensayarse, y esa norma se ha seguido en el Departamento de Justicia, que no debía ensayarse al Ledo. Calderón en la Corte de Distrito de San Juan, que es la Corte que más importancia tiene en la Isla de Puerto Rico y entonces se pensó que como el Señor Massari es un Juez at-large y ejerce sus funciones en toda la Isla de Puerto Rico y se le traslada de un distrito a otro ejerciendo sus funciones de Juez de Distrito at-large, que no había ningún inconveniente para que el Juez Massari pasara a Guayama, el Ledo. Calderón a Bayamón y el Juez Belaval a San Juan y también porque dada la proximidad de la Corte de Distrito de Bayamón a San Juan, donde tiene su residencia el Juez Calderón, éste estaría en mejores condiciones y no haría objeción a aceptar el cargo por la cuestión de estar muy retirado del domicilio y al Juez Calderón le sería fácil venir todas las tardes a su casa.

P.—¿Es cierto que el Juez Massari es el Juez de Distrito at-Large, pero él estaba desempeñando sus funciones en San Juan? R.—Sí, señor. P.—¿Y el Juez Massari reside en San Juan? R.—Sí, señor. P.—¿Y por qué había de pensar el testigo en el inconveniente para el Juez Calderón ir a Guayama? ¿Por qué no pudo ser enviado el Juez Calderón a Guayama y dejar a Massari en San Juan? R.—Primero, porque el Ledo. Calderón le había dicho al Juez Barceló que él no aceptaba ir a Guayama y segundo porque en cuanto al Juez Massari era un deber de él ir donde el Procurador General lo asignara porque de acuerdo con la ley que establece su cargo, él viene obligado a ejercer sus funciones en toda la Isla y en cuanto al Ledo. Calderón, éste no iba a prestar el servicio como un deber impuéstole por la ley sino sencillamente como una oportunidad que se le brindaba a él para ensayarse como juez de distrito. P.—Usted ha manifestado que era el deber del Juez Massari ir donde el Departamento lo mandara. Eso es así, pero en este momento no investigamos y no tratamos de investigar los deberes del Juez Massari. Se trata de la necesidad indispensable que hubiera en ese momento de trasladar a Massari de San Juan para Guayama. R.—Yo quiero manifestar, a lo que acaba de decir el señor Fiscal, que [lo que] yo trato de explicar es la motivación que según yo le entendí al Juez Barceló que dió lugar a. que él ideaso el traslado del señor Belaval y el traslado de él propio temporalmente de la Corte de Distrito de Guayama dentro de esta combinación judicial.'' Exhibit EX, págs. 158-161.

dova, es decir; se restableciese el statu quo que existía cuando se firmó el auto alternativo, pues como hemos indicado anteriormente el Juez Massari permaneció en San Juan hasta el 7 de mayo. Volviendo el Juez Massari a la Corte de Distrito de San Juan, el Juez Belaval hubiera regresado a la Corte de Distrito de Bayamón, donde hubiera podido resolver los varios asuntos urgentes e importantes que había dejado pendientes.

Pero las cosas no se desenvolvieron como debía esperarse. El Juez Belaval continuó como Juez Interino de la Corte de Distrito de San Juan y el 2 de mayo se le extendió un segundo nombramiento, de ese modo habilitándolo para conocer del caso de mandamus que había señalado el Juez Massari para el 2 de mayo de 1944.

El 9 de mayo, fecha en que finalmente se llamó el caso a juicio en sus méritos, el querellado, como abogado del interventor Partido Unión Republicana Progresista, presentó la moción de inhibición antes transcrita y solicitó que dicha moción se oyese y resolviese antes de dar principio al juicio. Accedió el Juez a oír la moción, pero luego de leída por el querellado, al anunciar éste que se proponía utilizar los testimonios del Juez Belaval, del Sr. Campos del Toro y otros, tuvo lugar el siguiente incidente:

"La Corte: . . . Ahora bien, frente a esta moción de inhibición, que yo voy a declarar sin lugar de plano, el Juez que preside este Tribunal quiere que en el récord consten los siguientes hechos:

"Sr. González Blanes: ¿Me permite la Corte? Si vuestro Honor va a hacer declaraciones sobre hechos que le constan a vuestro Honor, yo deseo que se nos ofrezca a nosotros entonces la oportunidad de traer prueba con respecto a cualquier cuestión de hecho que vuestro Honor desee hacer constar en el récord.

"La Corte: Después que yo haga eso, lo discutiremos. Es bien sabido en Puerto Rico que don Enrique Campos del Toro fué nombrado Procurador General. Es un hecho sabido en Puerto Rico que el Lic. Antonio R. Barceló, Juez de la Corte de Distrito de Guayama, pasará a ocupar el cargo de Primer Procurador General.

Tan pronto se supo el nombramiento del señor Enrique Campos del Toro se me llamó a mí a una reunión en casa del Lic. Enrique Campos del Toro, en la cual estuvimos presentes el Lic. Enrique Campos del Toro, el Juez Barceló y yo. En esa reunión se me preguntó si yo creía que representaba un perjuicio para Antonio R. Barceló dejar su puesto de juez y venir a ocupar el puesto de Primer Procurador, porque el Lic. Enrique Campos del Toro había decidido que el Primer Procurador General de Puerto Rico Auxiliar fuera el Juez Barceló. Entonces existía el problema de que al Juez Barceló había que darle unas vacaciones para resolver los casos que él tenía pendientes, para hacerse cargo de la Primera Subprocuraduría General. Allí se discutió quién de los dos podía, si el Juez Massari podía cubrir esa plaza en Guayama, y se llegó a la conclusión de que por ser el Juez at Large, era conveniente de que fuera el Juez Massari quien cubriera esa plaza, porque ésas son sus obligaciones como Juez de Distrito at Large.

"Entonces, al momento de considerar la vacante en San Juan, se me consultó a mí si yo creía que yo podría ser nombrado, de que era el propósito del Departamento de Justicia considerar mi nombramiento en propiedad, si como se esperaba en aquellos días, el Juez Córdova Díaz sería nombrado Juez del Tribunal Supremo. Tuvimos todas las discusiones. Yo presenté mis argumentos en cuanto a lo que yo tenía que hacer, el tiempo que se me tenía que dar para la nueva combinación. El señor Campos del Toro aquella noche me informó que el Juez Jorge Luis Córdova sería nombrado de un momento a otro, que esa era la impresión que él traía de Wáshington. Entonces se mandó al Juez Calderón, porque el Juez Calderón, si el Juez Jorge Luis Córdova va a la Corte Suprema y yo vengo a la Corte de Distrito de San Juan, con toda seguridad será el juez en propiedad de Bayamón, y se mandó al Lic. Borinquen Marrero a Guayama, porque con toda seguridad Borinquen Marrero será juez en propiedad de Guayama.

"Claro, ésta fué una conversación informal y el Procurador General puede cambiar este criterio cuando él lo crea conveniente, pero yo he venido aquí bajo la impresión de que si el Juez Jorge Luis Córdova pasa a la Corte Suprema yo inmediatamente recibiré, por lo menos el Attorney General me recomendará para Juez de la Corte de Distrito de San Juan en propiedad.

"Después de esas manifestaciones en el récord, que es lo único que quería hacer constar, la moción me parece simplemente una coacción moral ante los tribunales, cuya coacción moral yo, como Juez, no voy a tolerar, y la voy a declarar sin lugar de plano." Junta Insular de Elecciones v. Corte, 63 D.P.R. 819, 827.

## V

No era ésa la forma de resolver la moción. En ella se hacía una grave imputación al juez y silenciando al acusador no se destruía la acusación. Pero es que, además de esto, el interventor tenía derecho a que su caso fuese resuelto por un juez imparcial y esa circunstancia y la situación en que, consciente o inconscientemente, se había colocado el juez, imperativamente demandaba que concediese al interventor una razonable oportunidad de presentar la evidencia que ofrecía.([12]) Si lograba probar las alegaciones de su moción, se reconocería su derecho a un juicio imparcial inhibiéndose el juez. Si por el contrario no las probaba, la duda sembrada por la imputación quedaría disipada. Como se dijo en *State Ex Rel Barnard* v. *Board of Education,* 19 Wash. 8, 18:

"César exigió que su mujer no sólo fuese virtuosa sí que estuviese libre de sospechas; y el estado no debe ser menos exigente con sus funcionarios judiciales en cuyas manos se confían no sólo los intereses económicos, sino el honor, la libertad y las vidas de sus ciudadanos, y debe velar porque la balanza en que se pesan los derechos del ciudadano esté exactamente en el fiel, porque como muy bien dijo el Juez Bronson en *People* v. *Suffolk Common Pleas,* 18 Wend. 550: 'Lo más importante después del deber de dictar una sentencia justa, es que se haga de tal forma que no pueda levantar sospechas de la imparcialidad e integridad del Juez'".

Es de notarse que no existe evidencia como tal en el récord para sostener el cargo que hace el querellado contra el Gobernador Tugwell por el delito de soborno consistente en haber ofrecido secretamente al Juez Belaval ascenderlo al puesto de Juez de Distrito de San Juan en el entendido de

---

([12])No hay duda que el querellado tenía perfecto derecho a presentar prueba en apoyo de su moción. *Junta Insular de Elecciones* v. *Corte,* supra, pág. 828. El no oírlo entonces tendió a perjudicarle, pues por lo general un hábil interrogatorio en el momento oportuno, resulta más eficaz como medio de extraer la verdad, que declaraciones de los mismos testigos tomadas ex parte varios meses después de ese momento decisivo.

que éste último decidiría el caso en cuestión en favor de los demandantes. De igual modo tampoco existe evidencia alguna como tal contra el Juez Belaval para sostener la imputación de haber aceptado la dádiva. Somos de opinión que si bien el querellado se excedió al hacer la imputación de soborno contra uno y otro funcionario, actuación del querellado que desaprobamos, sin embargo, todos los hechos que hemos expuesto en detalle en esta opinión y las circunstancias concurrentes en este caso no justifican que el querellado sea disciplinado en forma o manera alguna.

*Procede declarar sin lugar la petición de disbarment.*